Scott **GOODERMOTE**, Petitioner–Appellant

v.

**STATE of Tennessee and Tennessee Claims Commission, Respondents–Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 24, 1993.

Application for Permission to Appeal Denied by Supreme Court June 1, 1993.

J. Stanley Rogers, Christina Henley Duncan, Rogers, Richardson & Duncan, Manchester, for petitioner-appellant.

Charles W. Burson, Atty. Gen. & Reporter, John Knox Walkup, Sol. Gen., Brenda Rhoton Little, Asst. Atty. Gen., Nashville, for the Tennessee Claims Com'n.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiff, Scott Goodermote, from the action of the Claims Commission in dismissing his petition in which he sought damages for injuries he received in a single automobile accident in Coffee County, Tennessee, on 18 May 1982.

The pertinent facts are as follows:

On 18 May 1982, plaintiff was a passenger in a 1973 Ford automobile driven by Timothy Arnold. Plaintiff and Mr. Arnold were both members of the United States Air Force and were traveling from an air force base in Ohio to Eglin Air Force Base in Florida to which they had been transferred. The vehicle driven by Mr. Arnold was traveling east on Interstate 24 immediately prior to the accident.

Plaintiff was seventeen years old at the time of the accident and was riding in the front passenger seat with his seat belt fastened. He was asleep at the time of the accident with his head resting against the window of the right front door. Plaintiff did not remember anything about the accident and the first thing he remembered following the accident was being transported to the hospital.

Sergeant Lonnie Ashburn, a twenty-year veteran of the Tennessee Highway Patrol, was called by the plaintiff as a witness and testified that he was the officer who investigated the accident which occurred just

prior to 7:00 a.m. on 18 May 1982. Sergeant Ashburn testified that when he arrived at the scene, the 1973 Ford Maverick was off the interstate and on Monoguard Road and that it was apparent that Mr. Arnold, the driver of the Ford automobile, had fallen asleep and that the Ford had traveled off the left side of the roadway and entered the grass median near mile marker 110 on I–24. Mr. Ashburn testified that he estimated the path of the Ford automobile by observing the tracks in the grass. He further testified that the vehicle traveled approximately seven hundred feet in the middle of the median and then traveled down the embankment before stopping at the bottom of the embankment on Monoguard Road. There was no evidence that the driver had applied the brakes on the Ford automobile prior to the impact. The entire front portion of the Ford automobile had been damaged.

At the accident scene are twin bridges, one on each side of the interstate, extending over Monoguard Road which passes under the interstate. The bridges were 61.25 feet apart. An embankment led from the median of I–24 down to Monoguard Road, a distance of twenty-eight feet from the top of the embankment to the bottom. The distance from the bridge to the road below is nineteen feet. A farm-type fence was across the side of the embankment approximately three to four feet from the top, however there was not an earthen berm or guardrail extending between the twin bridges. A guardrail ran along the left side of the eastbound lane of traffic one hundred fifty feet from the bridge and curved toward the median and to the ground. The sixty-four foot wide median sloped downward and created a "ditch." There were no trees at this location. As the eastbound lane of traffic approaches the twin bridges, the roadway curves to the right.

Tennessee Highway Patrolman Bobby South was also called by the plaintiff. Trooper South testified that he investigated an accident which occurred at the same twin bridges on 8 October 1975 and that that accident also involved one vehicle, which was driven by a Mr. Billy Floyd.

Mr. Floyd was a former Tennessee Highway Patrolman who resigned on 6 August 1973. He testified concerning the October 1975 accident that he was traveling east on I–24 when a tractor trailer truck ran him off the left side of the roadway, that his motor vehicle left the roadway and traveled between the twin bridges and down the embankment. He further testified that at the time of that accident there were no guardrails or earthen berms covering the opening between the twin bridges and that a farm-type fence, which was between the bridges, jerked the gas tank off of his vehicle.

Trooper South further testified that he assisted in the investigation of another one-vehicle accident which occurred at the same location and involved a one and one-half ton U–Haul truck. This truck was also traveling east on I–24 and two persons were burned to death in that accident. Mr. Floyd observed the scene of the U–Haul truck accident and testified that the vehicle in which Mr. Goodermote was riding landed ten to fifteen feet from where the truck burned.

For the purpose of establishing notice to the State of the existence of a dangerous condition, the plaintiff introduced an accident report of 21 May 1981. The vehicle involved in the 21 May 1981 accident was traveling east on I–24 when it left the roadway, ran through a farm-type fence, down an embankment between twin bridges and into a creek. This accident occurred near the instant accident site.

Mr. Jarvis D. Michie, a professional engineer, testified that he was the project manager of the NCHRP project which produced the National Recommended Procedures for the Safety Performance Evaluation of Highway Appurtenances. Mr. Michie inspected the site of the instant accident on 4 November 1987 and, based upon the information he had relevant to the instant accident, including the site inspection, photographs, and the proposed highway plans adopted by the State of Tennessee, he testified that the earliest date on the plans was 1965 and that all of the plans showed that guardrails or earthen berms were to be

placed across the opening between the twin bridges. The proposed plans called for a 150 foot guardrail to run parallel with the roadway in addition to the safety barrier. The earthen berm feature was a later development that was to replace a heavy guardrail.

Mr. Michie further testified that the twin bridges at the accident site fell within the classifications of the various guardrail and earthen berm treatments shown on the plans; that the standard of care in the industry at the time the road was planned and constructed was to place guardrails across the openings between the twin bridges. The guardrail and earthen berm treatments as shown on the plans were consistent with the industry standards in effect when the highway was built. The standards were recognized in the engineering community. Mr. Michie further testified that the guardrails or berms were necessary as a safety feature, because national statistics showed that motor vehicles would leave the roadway and enter into the area between the twin bridges.

Mr. Michie calculated the maximum speed of the vehicle in the instant accident at the top of the embankment as 17.6 miles per hour and the speed of the vehicle upon impact with the ditch as 29.6 miles per hour.

Mr. Michie testified that, based upon his experience, physical inspection of the site, and calculations, the injuries sustained by the plaintiff would have been much less severe if an earthen berm had been installed at the top of the embankment. Mr. Michie testified that the berm would have stopped the vehicle at the top of the embankment and the impact of stopping the vehicle at the top would have been much less severe than the impact at the bottom of the ditch. The evidence showed that the severity would have been a factor of two-thirds and that neither occupant should have sustained any kind of long-term injury if they were wearing seat belts, as they were.

If a guardrail had been installed between the twin bridges, the injuries would be even less severe than with the berm treatment because the guardrail would be deflective and the impact would have been softened. The fact that the impact occurred on an angle at the bottom of the ditch rather than at the top on the flat surface is another factor in the severity of the injuries due to the "submarine"[1] effect.

The evidence shows that if the plaintiff had not been wearing his seat belt at the time of the accident there would have been some AIS, four level injuries, which are injuries with permanent disability.

If the State had complied with the design standards that were in effect in 1965, the injuries the plaintiff received, if any, would have been much less severe than those he actually received.

The evidence further shows that the Tennessee Department of Transportation has a mapping and statistics office in the Planning Division. This department deals primarily with statistics, including data on accidents. Law enforcement agencies are required to send copies of accident reports to the Tennessee Department of Safety on a daily basis. The Department of Safety enters the information in the computer and forwards the data to the Department of Transportation. Approximately 170,000 accident reports are processed each year. The State is responsible for the maintenance of 14,000 highway road miles.

The Department of Transportation keeps the latest three years of accident data in the computer file, and each year a program is run that computes accident rates for different types of highway systems and forms a high hazard list. The records indicate that six accidents occurred within six-tenths of a mile of where the instant accident occurred during the three years prior to the instant accident. The actual rate for this stretch of I–24 would be .621 accidents per million vehicle miles of travel and the critical rate is .753 per million vehicle miles

1. When the vehicle went down the embankment, plaintiff, who was wearing a lap seat belt, was caused to slide down and under the seat belt, referred to in the record as the "submarine" effect.

of travel. In calculating the critical rate, the Department of Transportation attempts to omit accidents which would occur by chance. Accident locations on the high hazard risk list have a rating of approximately 5. Approximately forty locations in each district were placed on the high hazard list at the time of the instant accident. Accidents used in the calculations performed by the Department of Transportation did not include accidents with property damage of less than $400.00. Severity of the accidents was considered only for sites which were on the high hazard lists. Most of the sites on the high hazard list are city streets, according to the evidence. The Department of Transportation has the capability of analyzing particular locations, or all locations with twin bridges, to determine if guardrails are needed. However, the Department has never run that type of listing.

Plaintiff remained in the Coffee County Hospital for approximately two weeks and then transferred to the Air Force Hospital at Eglin Air Force Base, where he remained until 19 July 1982. Plaintiff's injuries included cuts above his eye, across the bridge of his nose, on his eyelid, and under his chin. Stitches were required for some of the injuries. Plaintiff also sustained a dislocated shoulder and injuries to his left knee and lower leg. Treatment for the injuries sustained by plaintiff included traction, surgery, and physical therapy. Plaintiff was required to wear a cast, a brace, and to walk with crutches or a cane at various times during his recovery. In January 1983, plaintiff refractured his left leg when he turned around while walking on a wooden floor in a bowling alley. In November 1984, plaintiff broke his left femur for a third time in a motorcycle accident. Plaintiff was discharged from duty in the Air Force in November of 1985 because the medical board found him unfit for worldwide duty. Plaintiff currently is required to wear an elevated shoe on his left foot because the left leg is shorter due to the injury sustained in the accident in the instant case.

Dr. Michael J. Fajgenbaum, an orthopedic surgeon who maintained offices at the University of Florida and the Veteran's Administration Hospital in Gainesville, Florida, testified that plaintiff's injuries included an angular deformity of the left femur, anterior cruciate insufficiency, and locking and swelling of the knee. He also testified that plaintiff's right leg was approximately four centimeters longer than the left leg as a result of the accident in the instant case.

The evidence further shows that as a result of the injuries sustained, plaintiff will retain a thirty-one percent permanent partial impairment to the body as a whole.

■ Plaintiff's first issue is: "The Commission erred in its holding that defendant, State of Tennessee, was not negligent under Tenn.Code Ann., Section 9–8–307(a)(1)(I)."

Tennessee Code Annotated, Section 9–8–307(a)(1) provides in pertinent part:

9–8–307(a)(1). Jurisdiction—Claims—Waiver of actions—Standard for tort liability—Damages—Immunities—Definitions—Transfer of Claims.—(a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state falling within one (1) or more of the following categories:

. . . .

(I) Negligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways, or bridges and similar structures, and negligence in maintenance of highways, and bridges and similar structures, designated by the department of transportation as being on the state system of highways or the state system of interstate highways.

Plaintiff insists that he is entitled to recover under Tennessee Code Annotated, Section 9–8–307(a)(1)(I) because the State was negligent in the planning, design, construction and maintenance of I–24 and the twin bridges at the site of the accident. Plaintiff further argues that the Claims Commission erroneously held that the State was not negligent and, even if the State

was negligent, its negligence was not the proximate cause of plaintiff's injuries.

The evidence shows that the State of Tennessee failed to install a guardrail, earthen berm, or other safety mechanism across the opening of the twin bridges, even though the plans for the highway included them.

■ Under general principles of the law of negligence, the plaintiff must establish that the defendant owed a duty of care to the plaintiff, injury, and conduct of the defendant falling below the applicable standard of care which amounted to a breach of the duty, causation in fact, and proximate, or legal, cause. *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991). Plaintiff insists that he established each and every element of a negligence cause of action and is therefore entitled to recover.

■ The State has a duty to exercise reasonable care under all the attendant circumstances in planning, designing, constructing and maintaining the State system of highways. *See*, Tenn.Code Ann., Sec. 9–8–307(a)(1)(I). The State owes this duty to persons lawfully traveling upon the highways of Tennessee.

We are of the opinion that the evidence shows that the State breached the duty of care in the construction of the roadway at the site of the instant accident by failing to install a guardrail, earthen berm, or other safety mechanism across the opening between the twin bridges. The State failed to exercise reasonable care in the construction and maintenance of the accident site. The State failed to construct the appropriate safety features which were called for by the plans which were adopted by the State for this location.

The first plans called for the installation of a heavy guardrail and later plans called for the installation of an earthen berm in place of the guardrail. The plans also specified the use of these features in addition to a 150–foot guardrail which was to extend from the bridge and run parallel with the roadway. The evidence is that the various safety features which were specified on the plans began as early as 1965 and were at the time appropriate under industry standards.

If the guardrail or earthen berm as proposed in the plans had been installed as represented by the technology of the time, the State would have been in compliance with industry standards. Failure to comply with the plans was a failure to comply with industry standards. The type of safety feature called for in the plans was to be installed across the openings at the top of the embankment because national statistics had demonstrated that motor vehicles would leave the roadway and enter the area between the twin bridges. The uncontradicted testimony is that the standard of the industry in the engineering community was to place guardrails, earthen berms, or other safety barriers across the openings between the twin bridges. However, despite the fact that all of the plans introduced specified the need for safety mechanisms between the twin bridges, the State failed to install any safety devices. This conduct falls below the standard of care of the industry and/or reasonable conduct in light of the apparent risk.

In its opinion, the Commission discusses the fact that changes were often made at the site and that a representative of the Federal Government had to approve the "as built" plans. The "as built" plans were not introduced into evidence, so defendant did not establish that the "as built" plans omitted the safety barrier. However, even if the Federal Government representative approved any such plans, the State would not be relieved of liability. The State's conduct of failing to follow their own plans and industry safety standards constituted a breach of duty. The state engineers who prepared the plans and the industry in general recognized the need for safety barriers at the location where the instant accident occurred. However, despite this fact and the knowledge that there was a known risk of motor vehicles leaving the highway and traveling down the embankment, the State failed to install a safety feature at the time of construction or later when maintaining the highway. This failure constituted a breach of duty by the State.

The evidence further shows that plaintiff's injuries, if any had been sustained in the accident, would have been much less severe if either an earthen berm or guardrail had been installed across the opening between the twin bridges. Crash tests and various roadside hardware had been made to determine whether occupants would survive an impact under various conditions. An earthen berm or guardrail would have stopped the vehicle at the top of the embankment and the impact of stopping the vehicle at the top would have been much less severe than the impact which occurred at the bottom of the embankment. If the earthen berm had been installed, the occupants of the vehicle would have sustained, at most, minor injuries. However, because the vehicle was not stopped at the top the speed increased from a maximum of 18 miles per hour at the top of the embankment to a maximum speed of 29.6 miles per hour at the bottom upon impact. This increased speed, along with the "submarine" effect due to the downward movement of the vehicle, made the plaintiff's injuries worse than they otherwise would have been had guardrails or an earthen berm been installed. Evidence of this fact is uncontradicted. The absence of any safety feature was the cause, in fact, of plaintiff's injuries.

The Supreme Court, in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991), suggested a three-pronged test to determine proximate cause, as follows:

(1) [T]he tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the accident could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Id.* at 775 (citations omitted).

Here, the failure of the State to install safety features was the proximate, or legal, cause of plaintiff's injuries and the negligent conduct of the State was the substantial factor in bringing about the plaintiff's injuries. We know of no rule, and have not been cited to one, that would relieve the State from liability under these facts.

The State could and should have foreseen that harm would occur if the safety barriers were not installed. National statistics demonstrated that motor vehicles would leave the roadway and enter the space between the twin bridges. The uncontradicted evidence showed the industry standard and nationwide standard in constructing interstate highways called for the installation of safety barriers at locations with twin bridges similar to the twin bridges in the instant case. The State should have reasonably foreseen that injuries would occur when it omitted this safety feature which was set forth in its own plans.

The Claims Commission found that:

[T]he State had no duty to anticipate and provide against a driver falling asleep and leaving the roadway in a curve, traveling in the curve of the median some 700 feet, evading a 150 foot long guardrail that extended toward the center median, and proceeding over an embankment between the two bridges.

■ Contrary to the holding of the Commission, the plaintiff is not required to show that the State could foresee the specific facts of the accident before plaintiff can recover. Our Supreme Court discussed foreseeability in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991), as follows:

The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. "The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen." It is sufficient that harm in the abstract could reasonably be foreseen.

*McClenahan*, 806 S.W.2d at 775 (citations omitted).

It was necessary only that the plaintiff establish that the State could have foreseen the general manner in which the injury or loss occurred. *Id.* While it is unusual for a motor vehicle to travel the distance the vehicle in which the plaintiff was riding traveled in the median, this does not take the injury out of the realm of foreseeability in light of all the attendant circumstances. Here, the roadway curved to the right before the twin bridges and the median sloped downward to form a ditch which led to the opening at the top of the embankment. In light of all the circumstances, injury is foreseeable if a motor vehicle left the roadway. The concept of a forgiving highway was developed to allow for driver error, including leaving the roadway and traveling in the median, according to the evidence. The evidence further showed testing and experience demonstrate that motor vehicles will leave the roadway and enter the area between the twin bridges. This risk was reasonably foreseeable by the State and one which the State should have guarded against in the construction and maintenance of this section of the interstate.

The Commission also found that the conduct of the State was not the proximate cause of the accident because the actions of the driver, Timothy Arnold, were the proximate cause of the accident. We think that the evidence clearly shows that the actions of both the State and the driver were the proximate cause of the accident. "There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result." *McClenahan*, 806 S.W.2d at 775. We think that the evidence clearly shows that the negligence of the State in failing to follow its own plans regarding installing a safety barrier was a substantial factor in producing the injuries which the plaintiff sustained. The conduct of the State was a proximate cause of the plaintiff's injuries.

The Commission also discussed the doctrine of independent intervening cause, even though it does not appear to base its decision on the application of that doctrine.

Our Supreme Court has stated the rule regarding independent intervening cause as follows:

> With respect to superseding intervening causes that might break the chain of proximate causation, the rule is established that it is not necessary that tortfeasors or concurrent forces act in concert, or that there be a joint operation or a union of act or intent, in order for the negligence of each to be regarded as the proximate cause of the injuries, thereby rendering all tortfeasors liable.... An intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act could have reasonably been foreseen and the conduct was a substantial factor in bringing about the harm. "An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." "It is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed."

*McClenahan*, 806 S.W.2d at 775 (citations omitted).

Here, the highways were supposedly constructed as forgiving highways because misconduct on the part of drivers was anticipated, according to the evidence. The State had actual knowledge that some motor vehicles will leave the roadway because of the negligence of others, or even by chance. The evidence shows that the State calculates actual and critical rates of accidents and tries to eliminate the accidents caused by chance in these calculations. The conduct of the driver of apparently falling asleep and leaving the roadway does not relieve the State of Tennessee from liability since this type of conduct could reasonably have been foreseen.

The plaintiff established the element of an injury. He testified regarding his injuries and the treatment he received, includ-

ing surgeries, physical therapy, and the fact that it was necessary for him to wear a cast and a brace. This issue is sustained.

■ Plaintiff's second issue is: "The Commission erred in its holding that defendant, State of Tennessee, was not liable to the plaintiff under the theory that the State negligently created or maintained a dangerous condition on a state maintained highway."

Plaintiff insists that he is entitled to recover from the State because the State was negligent in allowing the dangerous condition to exist at the twin bridges at the accident site. The absence of a guardrail, earthen berm, or other safety feature across the opening between the twin bridges created a dangerous condition. Plaintiff established that the State had the requisite notice of the condition and the foreseeability of the risk. We are therefore of the opinion that plaintiff is entitled to recover.

Pursuant to Tennessee Code Annotated, Section 9–8–307(a)(1), the State owed a duty to plaintiff to exercise reasonable care under all the attendant circumstances to make the roadway safe. The plaintiff established the elements of injury and of causation in fact. Plaintiff also established that the State breached its duty by failing to install safety barriers called for in the plans. Here, unlike *Hames v. State*, 808 S.W.2d 41 (Tenn.1991), there are established industry standards controlling the installation of safety barriers. The evidence established that the standard in the industry as early as 1965 was to install safety barriers across the openings between twin bridges. Plaintiff also established that a dangerous condition existed at this location.

The Supreme Court, in *Sweeney v. State,* 768 S.W.2d 253 (Tenn.1989), adopted the following factors to be considered in determining whether a dangerous condition exists:

> The decision of whether a condition of a highway actually is a dangerous and hazardous one to an ordinary and prudent driver is a factual one, and the court should consider the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses in arriving at this factual determination.

*Sweeney,* 768 S.W.2d at 255 (citations omitted) (quoting *Holmes v. Christopher,* 435 So.2d 1022 (La.App.1983)).

The evidence established that there was no guardrail or earthen berm across the opening between the twin bridges and that the opening led to a twenty-eight foot embankment which sloped downward to Monoguard Road, which passed under the interstate; that the median sloped inward to create a type of ditch which led directly to the embankment; and that the roadway for the eastbound lane of traffic in which plaintiff's vehicle was traveling curved to the right prior to the twin bridges.

The State admitted that at least six accidents had previously occurred within six-tenths of a mile of this location within the three years prior to the time of the accident in which plaintiff was involved. The evidence shows two previous one-vehicle accidents in which the drivers, traveling east, left the roadway traveling to the median and down the embankment at the same site. Plaintiff also showed another accident which occurred at the twin bridges near the site of this accident under very similar circumstances. There is no evidence that the State had taken any measures to correct this condition since these previous accidents.

The evidence also shows that the roadway was not built and maintained in compliance with industry standards because of the absence of the safety barriers. The risk of a motor vehicle leaving the roadway and entering the area between the twin bridges was not only reasonably foreseeable, but was actually a known risk based on statistics and experience.

The State admitted knowledge of the condition of the accident site and also admitted that no safety barriers were installed across the opening between the twin bridges. The State had notice of six previous accidents which had occurred at or near this location in the three years imme-

diately preceding this accident. The State received copies of all accident reports and placed the data in a computer for analysis. The State had knowledge that two persons were burned to death at this accident site.

*Hames v. State,* 808 S.W.2d 41 (Tenn. 1991), is distinguishable from the instant case. In *Hames,* the Supreme Court held that the state was not negligent and that any negligence on the part of the state was not the proximate cause of the death of plaintiff's decedent. Plaintiffs, in *Hames,* alleged that the state was negligent in failing to erect lightning-proof shelters or maintain a warning system to vacate the golf course during electrical storms. The Court held that the state's conduct did not fall below the applicable standard of care. The Court stated that lightning was such a highly unpredictable occurrence of nature that the risk to be guarded against was too remote to impose liability. The Court further stated that dangers associated with playing golf in a lightning storm were obvious to most adults and that the plaintiff's decedent could have reached the safety of the clubhouse in two minutes. The Court found it significant that there were no industry standards to implement warning devices and that most golf courses did not have warning devices or lightning-proof shelters. *Hames,* 808 S.W.2d at 45.

Here, there are industry standards which called for the installation of safety barriers, and these have been the standards for more than twenty years. Additionally, the standards adopted by the State in the plans called for the installation of safety barriers. The risk that a motor vehicle would leave the roadway and enter the opening in the median was not too remote for the State to have guarded against. In *Hames,* the Court held that the absence of warning devices and lightning-proof shelters was not the proximate cause of the death of plaintiff's decedent, because there were two distinct causes unrelated in operation. The Court went on to hold that lightning was an act of God, which was the direct cause of death, and that the absence of shelters and warning devices merely furnished the condition by which lightening could strike the decedent. *Hames,* 808 S.W.2d at 45.

In the instant case, there are not two distant causes unrelated in operation since the absence of a safety barrier played a substantial factor in plaintiff's injuries. The evidence showed that had the State installed a safety barrier, plaintiff would have received only minor injuries, if any injuries at all.

We think the evidence clearly shows that the State was negligent. The evidence shows that a dangerous condition existed at the accident site under the factors set forth in *Sweeney v. State,* 768 S.W.2d 253 (Tenn.1989).

It therefore results that the decision of the Tennessee Claims Commission is reversed and the cause remanded to the Claims Commission for a hearing on the amount of damages to which the petitioner/appellant is entitled. Costs on appeal are taxed against the State.

TODD, P.J., and CANTRELL, J., concur.