**Karen HELTON, Surviving Widow of William T. Helton, Appellee,**

v.

**KNOX COUNTY, TENNESSEE, Appellant.**

Supreme Court of Tennessee, at Knoxville.

May 13, 1996.

John E. Owings, Chief Deputy, Knox County Law Director, Knoxville, for Appellant.

Tricia I. Dennis, Alley & Dennis, Chattanooga, for Appellee.

## OPINION

BIRCH, Justice.

William T. Helton was killed when the vehicle he was driving went off the Coward Mill Bridge in Knox County. His widow brought suit under the Tennessee Governmental Tort Liability Act (GTLA),[1] on the theory that the county was liable for the death of her husband and damage to his automobile. She relied on Tenn.Code Ann. § 29–20–203, which removes governmental immunity "for any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway, owned and controlled by such governmental entity."[2] She alleged that the bridge was unsafe because there were no guardrails on it. After a bench trial, the court found that the physical aspects of the roadway approaching the bridge and the bridge itself were not "defec-

---

1. Tenn.Code Ann. §§ 29–20–101 *et seq.* (1980 & Supp.1995).

2. The parties failed to designate the pleadings as a part of the record on appeal. Our conclusion that the case was brought under § 29–20–203 is based on the trial court's reference to that section in its Memorandum Opinion, and on references to that section in both parties' briefs.

tive, unsafe, or dangerous" and dismissed the case.

The Court of Appeals, however, found that the absence of guardrails was a proximate cause of Helton's death, reversed the trial court's judgment, and remanded for a determination of damages.

We granted Knox County's application for permission to appeal in order to address the following issues:

1. Whether the failure to install guardrails on Coward Mill Bridge rendered the bridge "defective, unsafe, or dangerous" and, if so, whether Knox County had actual or constructive notice of such condition for purposes of removing Knox County's immunity under § 29–20–203 of the GTLA; and

2. Whether under the "negligent act or omission" provision of § 29–20–205 of the GTLA the decision not to install guardrails on Coward Mill Bridge was a "discretionary function" such as would preserve Knox County's governmental immunity.[3]

After a thorough review of the record and a careful consideration of the arguments, we conclude that the bridge was not "defective, unsafe, or dangerous." Accordingly, governmental immunity is not waived under Tenn. Code Ann. § 29–20–203. Inasmuch as the installation of guardrails on a county roadway is a discretionary function that involves the weighing of public policy considerations, governmental immunity is preserved under Tenn.Code Ann. § 29–20–205(1) as well. The decision of the Court of Appeals is reversed; the trial court's order dismissing the case is reinstated.

### I

Coward Mill Bridge is a one-lane, single-span, stone-arch bridge built in 1895. The bridge is located in a hilly, sparsely inhabited area of Knox County on Coward Mill Road and is little used. The bridge lies at the bottom of a steep grade. Approaching the bridge from the east, the driver first must cross a railroad track located approximately five hundred feet from the bridge. The driver then must proceed downhill into a ninety-degree right curve. Randall Cox, Ph.D., a registered professional engineer whose specialty is mechanical engineering, testified that the maximum speed at which a driver could negotiate that first curve was less than thirty miles per hour. After passing through this first curve, one must travel seventy to eighty yards into a ninety-degree left curve. Cox testified that the maximum speed with which a driver could successfully negotiate the second curve was approximately twenty-two miles per hour. Upon completing this second curve, a driver immediately enters onto the bridge.

On the date of the accident, a sign reading "Warning—One Lane Bridge Ahead" was posted on the right-hand side of the roadway near the railroad tracks that cross Coward Mill Road. There were paddle boards—long narrow boards containing black and yellow hash marks—located on each side of the roadway at the ends of the bridge. These paddle boards become visible as soon as a driver exits the first curve and heads toward the second. Knox County traffic sign supervisor Henry Loy testified that the one-lane bridge sign and paddle boards were in full compliance with the recommendations of the Uniform Manual for Traffic Control Devices.

The surfaces of the bridge and roadway are asphalt. Fog lines define the edge of the road painted with reflective paint. The bridge does not have standard guardrails.

---

3. Even when a party relies on a particular section of the GTLA as a basis for the lawsuit, the courts are not bound by that designation. When the facts of the case, and the essence of the complaint make another section of the Act applicable to the case, the court may analyze the case under that other section in addition to, or instead of, the original section relied upon by the parties. Tenn.R.App.P. 13(b), 36(a); *Nance v. Westside Hospital,* 750 S.W.2d 740, 744 (Tenn.1988); *City of Memphis v. International Brotherhood of Electric Worker's Union,* 545 S.W.2d 98, 100 (Tenn. 1976). In this case, although the plaintiff purports to rely on § 29–20–203 as a basis for her lawsuit, both the plaintiff's brief and the defendant's brief are peppered with references to § 29–20–205. Because we believe the facts of this case warrant it, we have analyzed the issue of liability under both sections.

Instead, heavy stones line its edge. Each stone is about fifteen inches long, six to eight inches high, and weighs approximately a ton. They are not bonded to the bridge or to each other.

Elvin Moore, a district foreman for the Knox County Highway Department, testified that he used the bridge once or twice weekly. He had driven across it in good weather and bad. He stated that he had never had trouble negotiating the bridge. Furthermore, he had crossed the bridge two to three weeks prior to the accident and did not observe any deficiencies in either the roadway or the bridge at that time. Moore had examined the Knox County Highway Department complaint file for complaints about the bridge and found none; he did not recall ever having seen such a complaint. Moore had never received a report of an accident on the bridge prior to September 3, 1988, the date of Helton's accident.

Knox County had, however, been advised by inspectors of the Tennessee Department of Transportation that the lack of safety features on the bridge was "a serious deficiency." On August 6, 1985, the inspectors advised county officials to install approved approach rails. In January 1987, the inspectors recommended that both bridge rails and approach guardrails be installed. In January 1988, the inspectors renewed their recommendation that the county install approved bridge rails and approach guardrails. Because of costs[4] and concern for the preservation of this historic bridge, Knox County decided not to follow the inspectors' recommendations.

The accident occurred during the mid-afternoon on September 3, 1988. The road was slick from a heavy rain. No one witnessed the accident. Officer Charles Lassiter, Knox County Sheriff's Department, was the first person on the scene. He found Helton's car upside-down in Beaver Creek about six to ten feet from the right-hand

edge of the bridge. One of the large curb stones on the right-hand side of the bridge was missing. A stone that had been contiguous to it was precariously balanced on the right edge of the bridge. The space which had been occupied by the missing stone was twenty feet from the end of the bridge where Helton had entered. No skid marks or debris were visible on the roadway or bridge surface. Cox concluded that Helton had lost control of his vehicle and crashed through the stone curb. Cox stated he had considered the total weight of Helton and his car (approximately 3300 pounds) and the weight of the stone (1820 pounds) to calculate the force necessary to move the stone. He concluded that a vehicle traveling at a speed of six miles per hour could have moved the stone two feet laterally. Clearly, the stone curbs in place on Coward Mill Bridge at the time of Helton's accident served little purpose other than to outline the edge of the bridge; they obviously were not intended to prevent a vehicle from leaving the roadway.

## II

The first question is whether the bridge was in a "defective, unsafe, or dangerous condition" so as to waive the county's immunity under § 29–20–203. A general principle prevalent in both the common law[5] preceding the enactment of the GTLA and in the Act itself is that governmental entities are generally immune from liability for any injury resulting from the exercise of governmental or proprietary functions. Tennessee Code Annotated § 29–20–201(a) (Supp.1995) specifically restates this principle: "Except as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." The GTLA then removes governmental immunity "for injuries resulting from the

4. Evidence was introduced that following this accident the County installed approach rails and guardrails at a cost of almost $200,000.

5. See, e.g., Hill v. Beeler, 199 Tenn. 325, 286 S.W.2d 868 (1956).

negligent operation by any employee of a motor vehicle or other equipment," [6] "for any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway ... includ[ing] traffic control devices thereon," [7] "for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement," [8] and "for injury proximately caused by a negligent act or omission of any employee," with numerous exceptions.[9] Thus, the GTLA is in derogation of common law and must be strictly construed. *Mowdy v. Kelly*, 667 S.W.2d 489, 491 (Tenn.App.1983).

The plaintiff, in the case under review, brought suit under § 29–20–203(a), which removes immunity for injury caused by defective, unsafe, or dangerous highways. She contends that the bridge did not have guardrails. This contention, supported by the expert testimony that guardrails would have prevented Helton's car from going over the edge, constitutes her theory of liability.

■ Whether a particular site is defective, unsafe, or dangerous for purposes of waiving governmental immunity under § 29–20–203 is a question of fact. The case under submission is similar to the recently decided case of *Kirby v. Macon County*, 892 S.W.2d 403 (Tenn.1994). In *Kirby*, the bridge was little-used and in a rural area. Much of its traffic included farm equipment that could not have used the bridge had standard metal guardrails been installed. Accordingly, wooden wheel guards had been installed on the bridge. At the time of the accident, the surface of the bridge was iced over, causing the plaintiff's vehicle to slide over the edge. At the specific site where Kirby's vehicle left the bridge, some of the wooden wheel guards were missing. Kirby sued under two theories: first, failure to install guardrails was a negligent omission under § 29–20–205; and second, the absence of standard guardrails made the bridge defective, unsafe, or dangerous under § 29–20–203(a). We found (1) that the decision to install wooden wheel guards instead of standard metal guardrails was within the discretionary function exception of § 29–20–205 so that governmental immunity was preserved; (2) that the lack of standard guardrails did not make the bridge defective [10] so as to waive governmental immunity under § 29–20–203; and (3) that even if the missing wheel guards rendered the bridge unsafe, the county did not have actual or constructive notice of the condition so as to waive immunity under § 29–20–203.

■ . Whether a road or bridge is "defective, unsafe, or dangerous" necessarily depends on the standard of care imposed on governments when they are building and maintaining bridges. As this Court noted in *Fretwell v. Chaffin*, 652 S.W.2d 755, 756 (Tenn.1983), prior case law does not necessarily bear greatly upon the construction and interpretation of the GTLA. Prior case law does, however, provide a perspective as to the standard of care historically required of

6. Tenn.Code Ann. § 29–20–202(a) (1980).

7. Tenn.Code Ann. § 29–20–203(a) (Supp.1995).

8. Tenn.Code Ann. § 29–20–204(a) (1980).

9. Tenn.Code Ann. § 29–20–205 (1980).

10. Although the language at the end of Section I in *Kirby*, 892 S.W.2d at 406, appears to imply that we found that the lack of standard metal guardrails did not make the bridge defective *because* the decision to install guardrails is a discretionary function, that was not our intent. To clarify, as a matter of law, lack of standard metal guardrails does not render a bridge or roadway "defective, unsafe, or dangerous" *per se*. Rather, the courts should consider all of the physical aspects of a particular bridge, together with its location, the volume of traffic, the type of traffic it accommodates, and the history of accidents occurring there, to decide whether a particular bridge is "defective, unsafe, or dangerous." *Sweeney v. State*, 768 S.W.2d 253, 255 (Tenn. 1989). The issue of whether governmental immunity is preserved under Tenn.Code Ann. § 29–2–205(1) is a separate matter entirely. In other words, even when the decision whether to install guardrails is a discretionary function that preserves governmental immunity under § 29–20–205(1), it is possible that the lack of guardrails might render the bridge or roadway so defective, unsafe, or dangerous that immunity is waived under § 29–20–203.

governments in building and maintaining roads and bridges.

Traditionally, the standard of care imposed on governments in building and maintaining roads and bridges is one of reasonableness. For instance, in *Swain v. City of Nashville*, 170 Tenn. 99, 92 S.W.2d 405, 406 (1936), this Court noted, "a city or town is not an insurer against accidents upon its streets and sidewalks, but is bound to use only ordinary care to keep them in a reasonably safe condition for persons traveling in the ordinary modes, while exercising reasonable care and caution." Moreover, "[i]t [is] not its duty, however, to maintain guard rails of sufficient strength to prevent all accidents." *Id.* Quoting the New York Court of Appeals, the Court continued:

> All that was required of it was that it should erect such a railing, if any, as would be a sufficient protection for travel generally.
>
> The town was not bound to exercise extraordinary care to guard against unusual accidents.
>
> ... To impose on towns the burden either of constructing substantial barriers at every point of possible danger or of paying damages when unusual accidents occur which such barriers might have prevented would be to advance the present measure of liability beyond the rule of ordinary care into the field of insurance against accidental injury or death.

*Id.* (quoting *Roberts v. Town of Eaton*, 238 N.Y. 420, 144 N.E. 667 (1924)); *accord Lagua v. Hawaii*, 65 Haw. 211, 649 P.2d 1135 (1982) (applying Hawaii's version of the Governmental Tort Liability Act). In *City of Memphis v. McCrady*, 174 Tenn. 162, 124 S.W.2d 248 (1938), the Court addressed a case in which the plaintiff had tripped over a two and one-half inch obstruction protruding from a city sidewalk. The Court found this was not such a dangerous obstruction as to

amount to negligence and pronounced that "the municipality is liable when it appears that the obstruction constituted a danger from which injury might be reasonably anticipated." 124 S.W.2d at 249. In *Forrester v. City of Nashville*, 179 Tenn. 682, 169 S.W.2d 860 (1943), we noted, "Probability, not possibility, governs; that it is 'possible' ... does not make it dangerous."

As noted above, the GTLA abolished the distinction between governmental and proprietary functions of local government as related to tort claims. Since its enactment, however, courts have continued to affirm the duty of a governmental entity to maintain the road in a "proper, reasonably safe fashion." *See, e.g., Baker v. Seal*, 694 S.W.2d 948, 950 (Tenn.App.1984).

In 1989, this Court considered a claim against the State in *Sweeney v. State*, 768 S.W.2d 253 (Tenn.1989). The plaintiff in *Sweeney* was injured when the car in which he was riding left the road on a curve. The claim was made under Tenn.Code Ann. §§ 9–8–307(a)(1)(I) and (J) of the Claims Commission Act,[11] which are analogous to §§ 29–20–205 and –203, respectively, of the GTLA. The Court found the State was not negligent under subsection (I). Thus, the Court had to consider whether the curve was "a dangerous condition" under subsection (J). In resolving this issue, we stated:

> The decision of whether a condition of highway actually is a dangerous and hazardous one to an ordinary prudent driver is a factual one, and the court should consider the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses in arriving at this factual determination.

768 S.W.2d at 255 (quoting *Holmes v. Christopher*, 435 So.2d 1022 (La.App.1983)). In

---

11. Tenn.Code Ann. § 9–8–301 *et seq.* Subsection (a)(1)(I) addresses negligence in planning, designing, inspecting, constructing, and maintaining public highways and bridges. Subsection (a)(1)(J) granted the Claims Commission authority to hear claims based on dangerous conditions on state-maintained highways.

*Sweeney,* the road in question was reconstructed after a rock slide in 1978. Between March 7, 1981, and March 3, 1983, there were twenty-three single-car accidents on that same curve. An expert testified that a dangerous condition prevailed at the site. We concluded that the State should have foreseen the risk and that the District Highway Superintendent had adequate notice of the dangerous condition of the curve based on the accident history. The State was, therefore, liable for the plaintiff's injuries.

The Court of Appeals reached the same conclusion in *Goodermote v. State,* 856 S.W.2d 715 (Tenn.App.1993). In *Goodermote,* the vehicle in which the plaintiff was riding left the road and traveled between twin bridges and down an embankment, coming to rest in a ditch. The industry standard when the road was built required placing a guardrail or an earthen berm between the twin bridges because studies showed that vehicles would leave the road and travel through this area. There was no guardrail or berm at this accident site. There was testimony that if a guardrail or berm had been in place, the impact would have been less, and the plaintiff may not have incurred his injuries. More significant, however, was the fact that in the previous three years six accidents had occurred within six-tenths of a mile of plaintiff's accident site. Two accidents had occurred in exactly the same manner, in exactly the same place, as the plaintiff's accident. The Court of Appeals found that the state had been put on notice by the prior accidents, that this particular location was dangerous, and that it should have installed safety devices. Therefore, it held the

state liable for the plaintiff's subsequent injuries. 856 S.W.2d at 723.

The present case is distinguishable from *Goodermote.* Here, there are no prior recorded instances of anyone driving over the edge of Coward Mill Bridge. The fact that repeated accidents occur at a particular location may lead to the ultimate conclusion that the conditions at that location are inherently dangerous. *See, e.g., Goodermote,* 856 S.W.2d at 715; *Sweeney,* 768 S.W.2d at 253; *Seaton v. County of Scott,* 404 N.W.2d 396 (Minn.Ct.App.1987). However, the fact of, or absence of, prior accidents is only one element in the equation.

In this instance, we do not have a modern structure built during a time when the industry standards required the installation of guardrails. Rather, Coward Mill Bridge was built at the turn of the century before the concept of metal guardrails had evolved.[12] At the time of Helton's accident, the road leading to the bridge was adequately marked "one-lane bridge ahead." In addition, as a vehicle rounded the first curve to the right, the paddle boards would have been clearly visible to the driver. Because of the sharpness of the two curves on the approach to the bridge, a driver who had successfully negotiated the second curve would be traveling at a slow rate of speed. The edges of the bridge were clearly marked with reflective fog lines and the stone curbs. Under these conditions, we cannot find that Coward Mill Bridge was "defective, unsafe, or dangerous" to the ordinary, prudent driver. Accordingly, Knox County's immunity is not waived under § 29–20–203(a).

12. When the bridge was built in 1895, the law provided: "It shall be the duty of the various county courts of this State, in letting out all contracts for the erection of bridges, to require that they shall be made secure with good and substantial railing at the height of three feet." Stat. of Tenn. § 1273(i) (1871). That code section, however, was located in Chapter 7 of the Code, titled "Of Local Improvements." By its own terms, this chapter applied only to *private and local improvements.* The entire chapter was devoted to the requirements by which private persons applying to the courts for permission to construct toll-bridges, ferry landings and the like must abide. It is not clear from the record whether this bridge, now part of a public thoroughfare, was originally constructed by private persons or by the government. This statute is now codified at Tenn.Code Ann. § 54–11–205. The language remains the same, except that the words "county legislative bodies" have been substituted for the words "various county courts." The section has been moved to a chapter which deals with *public* fords, ferries, and bridges. Regardless of its present form, we do not deem it a directive for governments to go back and install three-foot guardrails on bridges that did not already contain such a feature.

### III

Although not raised by the plaintiff in the original pleading,[13] both parties have alluded to the discretionary function exception of § 29–20–205(1). Knox County argues that even if the lack of an adequate guardrail on Coward Mill Bridge could be deemed "dangerous" under § 29–20–203(a), the decision whether to install guardrails is a discretionary function; therefore, governmental immunity is preserved under § 29–20–205(1). As we pointed out in *Kirby,* "The application of one of these immunity exceptions does not necessarily preclude the application of another. In other words, it is conceivable that either provision might apply to remove governmental immunity. Likewise, it is possible that no exception will apply, thereby preserving governmental immunity." 892 S.W.2d at 406. Each section should be considered separately. To clarify, § 29–20–203(a), which removes governmental tort immunity for injury caused by a "defective, unsafe, or dangerous" condition of any street, alley, sidewalk, or highway, does *not* create an exception for discretionary functions. *Swafford v. City of Chattanooga,* 743 S.W.2d 174, 177 (Tenn.App.1987). Therefore, Knox County's reliance on this exception for a § 29–20–203(a) condition is misplaced.

Although we have determined that the lack of guardrails was not a defective, unsafe, or dangerous condition so as to waive governmental tort immunity under § 29–20–203(a), the nature of the plaintiff's allegations leads us to consider whether the decision not to install standard metal guardrails on Coward Mill Bridge was negligence under § 29–20–205. Section 29–20–205 provides for a waiver of governmental immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." However, immunity is not waived where the injury "[a]rises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Tenn.Code Ann. § 29–20–205(1). Thus, the key is whether the decision not to install guardrails at this site was a discretionary function.

We defined the "discretionary function" exception in *Bowers v. City of Chattanooga,* 826 S.W.2d 427 (Tenn.1992). In *Bowers,* we adopted the "planning-operational test" to aid in determining whether a particular act was a discretionary function. Under this test, "decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability." 826 S.W.2d at 430. In contrast, decisions that are merely "operational" or implement prior planning decisions are not "discretionary functions" and may subject the government to tort liability. *Id.* at 430–31. "Planning" decisions are those "involving the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices." *Voit v. Allen County,* 634 N.E.2d 767, 769–70 (Ind.Ct.App.1994). When deciding whether a particular decision is "planning" or "operational," the courts should keep in mind the purpose of the discretionary function exception, that is, "to 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *United States v. Gaubert,* 499 U.S. 315, 323, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (*quoting United States v. Varig Airlines,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)) (both cases discuss the discretionary function exception under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2674 *et seq.*). Moreover, "courts must not intrude into realms of policy exceeding their institutional competence. The judicial branch lacks the fact-finding ability of the legislature, and the special expertise of the executive departments.... [T]he courts ... should not attempt to balance the detailed and competing elements of legislative or executive decisions." *Industrial Indemnity Co. v. Alaska,*

---

**13.** *See supra* footnote 2.

669 P.2d 561, 563 (Alaska 1983).[14] The discretionary function exception covers acts involving an element of judgment or choice if they are based on considerations of public policy. *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). It is the nature of the conduct rather than the nature of the actor that governs whether the exception applies. *Gaubert,* 499 U.S. at 325, 111 S.Ct. at 1275. As we pointed out in *Bowers,*

> the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision.
>
> A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules.
>
> On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies.

These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act.

826 S.W.2d at 431 (citations omitted).

■ Another factor that should be considered when deciding whether an act is a planning decision or merely operational is whether the decision is one that is properly reviewable by the courts.

> The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interference by the courts. *See Wainscott v. State,* 642 P.2d 1355, 1356 (Alaska 1982). Put succinctly:
>
> > [T]he judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

*Bowers,* 826 S.W.2d at 431 (*quoting Peavler v. Board of Commissioners,* 528 N.E.2d 40, 44–45 (Ind.1988)). As in *Kirby,* 892 S.W.2d at 408, we find that the decision-making pro-

---

**14.** In *Industrial Indemnity Co.* the decedent was killed when his car left the road. The plaintiff insurance company sued alleging the state was negligent in failing to install a protective guardrail at the accident site. There was testimony that the original highway project proposal had included guardrails, but they were excluded in the final plan because of budgetary constraints. Alaska had adopted its Tort Claim Act which contained a discretionary function exception to negligent acts or omissions by the state almost identical to ours. *See* Alaska Stat. § 09.50.250(1)(1962). In finding that the decision not to install guardrails was a discretionary function, the court stated:

> [This] type[ ] of decision[ ] involve[s] planning, an assessment of competing priorities, and a weighing of budgetary considerations.... [I]t remains clear that guardrails are expensive, and that a decision by the state to place guardrails along the Glenn Highway would necessarily affect the state's ability to provide other governmental services. We would be engaging in precisely the type of policy evaluation that the discretionary function exception is designed to foreclose if we were to inquire into the wisdom of the state's guardrail policy in this case.

669 P.2d at 564–65 (citations omitted) (footnotes omitted).

cess in this case included the weighing of economic factors: the cost of installing standard guardrails against the perceived benefits that would result therefrom. Decisions that include the allocation of limited resources among competing needs do not need interference from the courts, absent clear guidance from the legislature to the contrary. *Accord Rothrock v. United States,* 62 F.3d 196, 199 (7th Cir.1995); *Baum v. United States,* 986 F.2d 716, 722 (4th Cir.1993). In this case, the decision not to install guardrails was discretionary. The legislature has decided by adopting the discretionary function exception in our Governmental Tort Liability Act to preserve governmental immunity under these circumstances.[15]

### IV

We conclude that the facts of this case do not support the Court of Appeals' conclusion that Coward Mill Bridge was defective, unsafe, or dangerous. Thus, the county's immunity from tort liability is preserved under Tenn.Code Ann. § 29–20–203(a). We conclude further that the decision not to install guardrails despite the recommendations of state inspectors falls within the discretionary function exception of the GTLA. The decision of the Court of Appeals is, therefore, reversed, and the trial court's order dismissing the case is, hereby, reinstated.

ANDERSON, C.J., and DROWOTA, REID and WHITE, JJ., concur.

---

**15.** The plaintiff tries to analogize this case to *Watts v. Robertson County,* 849 S.W.2d 798 (Tenn.App.1992), to argue that the decision not to install guardrails was not a discretionary function. In *Watts,* Robertson County had adopted a private act requiring the county road supervisor to "[m]ake inspections of all roads, highways and bridges of any such County to see that the same are in good repair and at all times safe for travel, and to that end to establish an inspection system" and "[k]eep all such roads, highways and bridges in good repair and safe for travel." 849 S.W.2d at 799 (quoting 1947 Tenn.Priv.Acts, 380, § 17(2) & (3)). Robertson County had delegated the responsibility for road inspections to the state. Four previous inspectors had noted the absence of guardrails at the point where the plaintiff's car left the road and had advised that

guardrails be installed. The Court of Appeals held that the failure to install guardrails under those circumstances was an operational act, not a discretionary function; therefore, the county was not immune from suit under § 29–20–205(1). This case is distinguishable from *Watts* in three major respects: first, the bridge in *Watts* had no guardrails or wheel guards at all; second, the record in this case does not support counsel's argument that Knox County had adopted such a private act; third, in *Watts* the county did not present any policy reasons for the failure to install the guardrails. They simply never read the inspection reports and never considered whether to install guardrails at all.