Maureen F. SWEENEY,
Plaintiff-Appellant,

v.

STATE of Tennessee,
Defendant-Appellee.

Supreme Court of Tennessee,
at Knoxville.

March 27, 1989.

Foy R. Devine, Devine & Morris, Atlanta, Ga., Sidney W. Gilreath, Knoxville, for plaintiff-appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Raymond S. Leathers, Asst. Atty. Gen., Nashville, for defendant-appellee.

## OPINION

FONES, Justice.

Plaintiff brought suit based upon T.C.A. §§ 9–8–307(a)(I) and (J)[1] against the State of Tennessee for damages for personal injuries she received while riding as a passenger in an automobile that was wrecked at a curve on U.S. Highway 41A in Franklin County. The Tennessee Claims Commission determined that plaintiff failed to prove that the State was negligent in planning, programming, inspection, design, construction, maintenance, or approval of plans and construction of the said location of the accident, and further failed to prove that a dangerous condition existed at the site of the accident. The Court of Appeals found a dangerous condition did exist at the point where the accident occurred, but plaintiff failed to prove that the State had notice of the dangerous condition sufficiently prior to the injury to have taken appropriate measures.

Plaintiff, at the time of the accident, was twenty years of age and attending the University of the South in Sewanee, Tennessee. On 22 April 1983, plaintiff was rendered a quadriplegic when the car she was riding in as a rear seat passenger was involved in a single vehicle accident. Plaintiff, along with five other individuals, was travelling in a westerly direction along U.S. Highway 41A from Sewanee toward Winchester, Tennessee. The accident occurred at approximately 7:00 p.m.; it was dusky dark and the highway was wet from rain that had fallen earlier in the day.

The driver of the vehicle testified that he had never driven this stretch of road from Sewanee to Winchester which is predominately downhill mountainous terrain. As he was travelling 35 m.p.h., with his headlights on, down a straight section of road he noticed that he was approaching a curve, and applied his brakes. The vehicle skidded off the highway over a small retaining wall and down a steep embankment. While the other occupants of the vehicle suffered only minor injuries, the plaintiff was thrown about in the vehicle causing a fracture of the cervical spine which resulted in permanent paralysis from the neck down.

Before the Claims Commission plaintiff based her claim upon T.C.A. §§ 9–8–308(a)(I) and (J). Upon review of the record, we do not find evidence to support a cause of action under subsection (I) for negligence by the State. The thrust of plaintiff's argument on appeal to this Court addresses subsection (J).

The issue is whether a dangerous condition existed at the situs of the accident on U.S. Highway 41A. If answered in the affirmative, then we must address the issue of whether the foreseeability of the risk and notice was given to the proper state officials at a time sufficiently prior to

1. T.C.A. §§ 9–8–307(a)(I) and (J) provides:
    (a) The commission or each commissioner sitting individually shall have exclusive jurisdiction to determine all monetary claims against the state falling within one (1) or more of the following categories:
    . . . .
    (I) Negligence in planning and programming, inspection, design, construction, maintenance or approval of plans and construction of public highways and bridges if such activity is mandated or undertaken pursuant to state or federal law;
    (J) Dangerous conditions on state maintained highways. The claimant under this subsection must establish the foreseeability of the risk and notice given to the proper state officials at a time sufficiently prior to injury for the state to have taken appropriate measures.

the injury for the State to have taken appropriate measures. T.C.A. § 9–8–307(a)(J).

## DANGEROUS CONDITION

Plaintiff insists that the "dangerous condition" factor was established by the proof of an inordinately high number of accidents at the location involved here, after the State redesigned the roadway, and by the testimony of her expert that safety measures, such as signs and guardrails, were inadequate to warn of the danger created by the steep grade and sharp curve.

■ Our statutes do not provide a definition of a dangerous condition, "on state maintained highways" for application in determining the State's liability under T.C.A. § 9–8–307(J). In *Holmes v. Christopher,* 435 So.2d 1022 (La.App. 4th Cir.1983), the Court defined the duty of the State of Louisiana with regard to highway conditions and applied it to the Mississippi River Bridge Authority, one of the defendants in the case. We find it to be an appropriate delineation of the factors involved in determining whether a dangerous condition exists on state maintained highways applicable to cases brought under T.C.A. § 9–8–307(J). We quote as follows:

> The decision of whether a condition of a highway actually is a dangerous and hazardous one to an ordinary prudent driver is a factual one, and the court should consider the physical aspects of the roadway, the frequency of accidents at that place in the highway and the testimony of expert witnesses in arriving at this factual determination. *Besnard v. Department of Highways,* 381 So.2d 1303 (La.App. 4th Cir.1980), writ denied. 385 So.2d 1199 (La.1980).

*Holmes,* 435 So.2d at 1026.

The evidence at trial established the stretch of road where the accident occurred was reconstructed after a rock slide in 1978. That work was completed in 1980. As a result of the redesign, a curve just prior to the present curve in the highway was removed. A 600 foot straight section of roadway at a downhill 6% grade was constructed leading into a 24° curve to the left, with a radius of 239 feet, resulting in a sharp, tight curve. Off the shoulder of the road at said curve was a sloping embankment covered with gravel, bordered by a low lying rock wall and beyond, large trees, boulders, and a ravine.

Plaintiff introduced reports of 23 single car accidents that occurred between 7 March 1981 and 3 March 1983 on the same curve that caused plaintiff's injury. Paul Waggner, who was the Chief of Police of Sewanee, testified that "considerably more accidents" happened on that curve after that location was redesigned than before. The State concedes that the commissioner erred and the Court of Appeals was correct in admitting and giving consideration to prior accidents on the dangerous condition issue, where such accidents occurred under substantially similar conditions. *See John Gerber Co. v. Smith,* 150 Tenn. 255, 263 S.W. 974 (1924); *City of Nashville v. Brown,* 25 Tenn.App. 340, 157 S.W.2d 612 (1941); *cf. Winfree v. Coca–Cola Bottling Works,* 19 Tenn.App. 144, 83 S.W.2d 903 (1935); and *e.g.* 40 Am.Jur.2d, *Highways, Streets & Bridges* § 601.

■ However, the State asserts that the erection of a two-foot by four-foot horizontal arrow behind the guardrail, at the entrance to the curve, about three weeks before plaintiff's accident significantly altered conditions at the accident site and rendered the prior accidents "irrelevant and incompetent." The new sign was erected by John Gibson, the state maintenance superintendent for that region because he was aware from newspaper accounts and observations at the site that a number of accidents were occurring at that location. Unfortunately, the arrow sign added no warning of any significance. The pictures reveal that the guardrail which was present *at the beginning* of the sharp curve gave more notice of the existence of a curve than the added sign. The problem was the sharpness and tightness of the curve at the end of a long, steep downgrade, which plaintiff's expert said required a 90° curve sign as opposed to a mild curve sign. We find no merit to the State's contention. The accident reports of

the officers who investigated the 23 accidents during the two year period before plaintiff's accident, uniformly contained language to the following effect, in response to DESCRIBE WHAT HAPPENED: "Drive lost control on sharp curve, ran off road and over low retaining wall."

■ On the date of the accident some distance up the road prior to the curve, there was a 36 × 36 inch 45° curve sign under which was attached a 30 m.p.h. advisory plate. In addition, at the beginning of the curve was a 2 × 4 foot arrow sign pointing in the direction of the curve. The arrow sign was erected on 29 March 1983, three weeks prior to the accident. Plaintiff contends that the foregoing signs did not adequately warn the public and give them reasonable notice of the dangerous curve. Since it is virtually impossible to eliminate curves when constructing roadways through mountainous terrain, this hazardous condition could be minimized by traffic control measures such as adequate signing, pavement markings and guardrails.

At trial, George Black was plaintiff's expert witness. He has a degree in civil engineering from Georgia Tech, specializing in transportation engineering with extensive experience in traffic crash research and investigation. He was of the opinion that a dangerous condition prevailed at the particular segment of roadway in question. He testified:

it [the 6% downhill grade on a straight stretch] produced ... a chute type effect. The old alignment [prior to the 1980 reconstruction] restrained the speeds of vehicles somewhat because of its curviness. These are apparently irregular curves also, and that would have lowered the speeds of the drivers. Once the new project was opened, there was a straight downhill stretch similar to a roller-coaster where a vehicle would tend to gain speed, and then be immediately dumped into a very tight left hand curve.

Black further testified that the 30 m.p.h. advisory plate would have dictated a 90° turn sign as opposed to the 45° turn sign in place at the time of the accident, which was technically improperly posted according to the Uniform Manual for Traffic Control Devices. He would have used a 48 × 48 foot sign rather than the current 36 × 36 foot sign. Black found that the posted 30 m.p.h. advisory plate would be at the top of the appropriate range given all the other factors associated with the curve. Additionally, the questioned curve required five or six chevron markers. He said the advantage of such signs over the straight arrow was that they outline the outer edge of the curve to give the motorist the direction of the curve and some perception of the severity.

Black concluded that the "single big arrow would indicate there was something there, but it would not have given very much information to the driver about what was there. ... In other words, it could have been a relatively mild curve or it could have been a sharp curve. ... I don't believe that was adequate traffic control signing."

On the date of the accident the guardrail terminated just past the beginning of the curve. Black testified that the guardrail should have extended around the curve and the failure of such violated the standards set forth in the American Association of State Highway Transportation Officials (AASHTO) in addition to violating good engineering judgment.

The State's expert was Thomas Darcy Sullivan, a civil engineer with a Master of Science Degree, specializing in traffic engineering and highway safety. He had approximately 25 years experience in transportation engineering and safety, and at the time he testified he was living in Knoxville, and was employed by MCI Consulting Engineers, in charge of the transportation activities of that firm.

The State sought to eliminate the significance of the 23 accidents on the dangerous condition issue through Sullivan's testimony about the approach used by the Department of Transportation to identify and improve high hazard locations; which are called Tennessee Road Information Systems (TRIMS). That department obtains copies of the accident reports that all inves-

tigating officers are required by statute to file with the Department of Safety. Information from those reports are fed into the computer and eventually result in the production of a statewide "critical rate", and an actual rate for potentially high hazard locations. At the locations where the actual accident rate exceed the critical rate, a formula that factors in personal injuries, fatalities and property damage and produces an "economic loss difference" determines the ranking of that location.[2]

Sullivan testified that he examined the data that produced the high hazard location ranking for Region II. The critical rate for the applicable period was 1.26 accidents per one million vehicles and the actual rate at the subject location was 1.49 accidents per one million vehicles, which, according to Sullivan, rated the subject location at 20% higher than the critical rate. But, he testified that in Region II, "this particular spot is in position # 452 out of about 480." He elaborated by saying that it means there were 451 spots ranked more serious in terms of loss difference.

It was eventually revealed that the 12 accidents that occurred in 1981 at the subject location had been "purged out of the computer" and that only 5 of the 11 that occurred in 1982 and through 3 March 1983 had actually been used in determining the rank of 452. Sullivan said the missing reports (other than the 1981 reports) "got lost in the process some way—and I am not aware of any explanation or where the break down occurs." He admitted on cross-examination that if all of the accidents that had actually occurred at the location of plaintiff's accident had reached the computer, it would have been very close to the top of the list and probably red flagged. Thus, factually, the scene of the accident was a very high hazard location, even though the TRIMS report indicated otherwise.

Sullivan also testified that the signing at the location of the accident was appropriate and more than met the minimum require-

ments of the AASHTO manual. Sullivan testified that traffic barriers (guardrails) should be installed discriminately and only if it reduces the severity of a potential accident. "If the guardrail is at a fairly shallow angle that is what generally happens. If the impact is at a steep angle the vehicle can become entrapped in the guardrail and actually penetrate it, form a pocket and come to a very rapid deceleration," which can cause more severe injuries than the embankment.

Upon review of the record we find the accident in which plaintiff was injured was substantially similar to the 23 single-vehicle accidents which preceded her accident. Typically the accidents on this particular curve occurred at dusk or after dark, often on wet pavement when the vehicles slid off the road trying to negotiate the sudden curve at the end of a downgrade road. Considering all the evidence on this issue, we agree with the Court of Appeals that a dangerous condition did exist at the point where the accident occurred and was a contributing proximate cause of the accident and plaintiff's resulting injuries. The combination of a steep grade, sharp curve, inadequate signs, lack of other safety measures such as chevrons and/or guardrails, together with the inordinately high number of accidents at the situs established a dangerous condition within the meaning of T.C.A. § 9–8–307(a)(J). The 23 accidents after the reconstruction and prior to plaintiff's accident clearly provided the element of foreseeability of risk.

### NOTICE TO THE PROPER STATE OFFICIALS

The 23 accident reports exhibited in this record reflect that 4 were prepared by Tennessee Highway Patrol officers and 19 by officers of the Sewanee Police Department. The State insists it had notice of only 5 of the 23 accidents for the period 1 January 1982 to the date of plaintiff's accident. However, that claim is based upon Sulli-

**2.** Sullivan testified that he obtained this information from a TRIMS report [Tennessee Roadway Information System], a Department of Transportation publication that is apparently updated annually, based upon the prior three years accident reports. The one Sullivan used had dropped the 1981 accident reports, thus was for 1982 and later.

van's testimony that only 5 accident reports reached the computer in the Department of Transportation, but he concedes that all accidents that occurred in calendar year 1981 had been purged from the computer. The record shows that 12 accidents occurred at the subject location in 1981.

Plaintiff insists that the testimony of Paul Waggner, Chief of the Sewanee Police Department, was sufficient to invoke the presumption that the reports of the 19 accidents investigated by the officers of that department were received by proper State officials in the due course of mail.

Without any discussion of the evidence, the Court of Appeals disposed of the notice issue in a two-sentence paragraph as follows:

> The record does not establish whether the State received reports of the accidents not placed in the computer. There is no evidence of the actual mailing, which is necessary to establish the presumption the reports were received in due course. *Modern Upholstery [Upholstered] Chair Company v. Henry*, 213 Tenn. 475, 376 S.W.2d 441 (1964).

■ Factually and legally that issue is close and difficult of resolution.[3] However, we pretermit addressing it because we find that John Gibson and Raymond Rucker were proper state officials for the purpose of notice of a dangerous condition and that they had notice of the dangerous condition that existed at the subject location, sufficiently prior to the accident to have taken appropriate measures as required by T.C.A. § 9–8–307(J).

John Gibson became Highway Maintenance Superintendent of District 25, consisting of four counties and 500 or 600 miles of roadways, on 21 March 1983. He had over twenty years of service in highway construction with the Tennessee Department of Transportation at the time of his appointment as Highway Maintenance Superintendent. He described his primary responsibility as "keeping the roads safe

for public travel in any kind of conditions, keep signs visible."

He testified that he had read in the local paper that there had been some accidents on the curve where plaintiff was injured. Gibson lived near Winchester, in Franklin County and the accident scene is in that county. He also testified that he had seen skid marks and other physical evidence of accidents at that location. One of his first priorities after his advancement on 21 March was to make this location safer for the travelling public. He directed Joe Walker, a highway marking supervisor, to erect a 2 × 4 foot arrow behind the guardrail at the curve in question. That sign was erected on 29 March 1983, eight days after he assumed the position of superintendent of District 25.

Raymond Rucker was the regional traffic engineer for the region that included District 25. Gibson was asked if he was the final authority on putting up the arrow sign or was required to obtain permission from someone else. His response was:

> I'm sure Joe Walker called the Regional Traffic Engineer. ... I believe he talks to the Region before he erects any signs. They come out of inventory, and probably for records or whatever.

The State and plaintiff read brief excerpts from the pre-trial deposition of Raymond Rucker, but the deposition was not filed and is not in the record before us. The portions of the deposition read into the record do not deal with notice to or permission of Rucker to erect the arrow sign.

The statutes are silent as to who are "proper state officials" for the purpose of notice pursuant to T.C.A. § 9–8–307(J). We are of the opinion that a District Highway Superintendent whose primary responsibility is to keep the roads safe for public travel in any kind of conditions, and to keep warning signs visible is one of the proper state officials for the purpose of satisfying the notice requirement. The Court of Appeals implicitly regarded Gibson as a proper state official in rejecting plaintiff's claim

---

**3.** *See* 45 A.L.R. 476, containing 27 variations in the proof required to establish a mailing custom.

for the reason that she had failed to demonstrate that the maintenance superintendent "was apprised of a sufficient number of accidents to constitute notice of the dangerous condition." We disagree with the Court of Appeals' rejection of notice to Gibson.

After Gibson's testimony that the arrow sign was erected at the onset of the curve on 29 March 1983, the transcript continues as follows:

Q. And you took over when?
A. March 21.
THE COURT: Seems like that may have been your number one priority.
A. It was one of the first things.

 We conclude that Gibson regarded the curve where plaintiff was injured as one of the most dangerous, if not the most dangerous location in his jurisdiction of 500 or 600 miles of roadway in four counties. He took immediate action in an effort to make the location safer for the travelling public and in the course of doing so assumed that his action would be brought to the attention of, and approved by, Raymond Rucker. The evidence that Rucker had knowledge of the action of Gibson in erecting the arrow sign and the reason therefor is such that it was incumbent upon the State to have the regional traffic engineer deny it, if in fact it was not true. All of the elements necessary to invoke the missing witness rule are present. *See Delk v. State,* 590 S.W.2d 435 (Tenn.1979).

The State asked its expert, Sullivan, if it was reasonable for Gibson to make the decision to erect the arrow sign "without the advice or input of the traffic engineer." Sullivan had never been employed by the Tennessee Department of Transportation, but he answered as though the question had been posed as follows: "Was it reasonable for Mr. Gibson to make the decision to erect the arrow sign without the advice or input of Mr. Rucker, the Regional Traffic Engineer for District 25?" His answer, in substance, was that a regional traffic engineer had jurisdiction of 25 or 30 counties and it would be unreasonable for him to "personally review or endorse every sign that is installed." However, when asked if

the problem was making a location where 23 accidents had occurred in a two year period safer, he said the district engineer and inferentially the district superintendent, should "seek additional advice."

We conclude from Sullivan's testimony that, in his opinion, a regional traffic engineer would be a proper state official for the purpose of notice of a dangerous condition.

We hold that plaintiff has proved her cause of action authorized by T.C.A. § 9–8–307(J) and is entitled to recover the damages she sustained in accord with the statute. This case is remanded to the Tennessee Claims Commission for a determination of those damages. Costs are assessed against the State.

HARBISON, C.J., and COOPER, DROWOTA and O'BRIEN, JJ., concur.