# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 20, 2009 Session

## GARY L. WATTS AND JANET WATTS, Parents And Next Friends of CLINTON D. WATTS, Deceased v. EARNESTINE J. MORRIS, ET AL.

### Direct Appeal from the Circuit Court for Shelby County
### No. CT-002527-05     John R. McCarroll, Jr., Judge

---

### No. W2008-00896-COA-R3-CV - Filed May 6, 2009

---

This case arises from the death of a graduate student near the University of Memphis. While crossing the street, decedent was struck by a vehicle. Decedent's parents, on his behalf, have sued the City of Memphis, pursuant to the Governmental Tort Liability Act, alleging that the City negligently maintained the defective, unsafe, or dangerous street that decedent was crossing. The trial court held that Plaintiffs failed to prove that the Governmental Tort Liability Act waived the City of Memphis' immunity from suit or that the City of Memphis was negligent. In addition, the court found that both decedent and the driver of the automobile that struck decedent were negligent and were each 50% at fault of the accident. We affirm on the basis that Plaintiffs failed to prove that the street was a defective, unsafe, or dangerous condition for which the City's immunity was waived.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; and Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, J., joined. HOLLY M KIRBY, J., filed a concurring opinion.

Richard M. Carter and J. Lewis Wardlaw, Memphis, Tennessee, for the Appellants, Gary L. Watts and Janet Watts.

J. Michael Fletcher, Memphis, Tennessee, for the Appellee, The City of Memphis.

# OPINION

## *Background*

On May 14, 2004, Clinton D. Watts ("Mr. Watts"), an engineering student at the University of Memphis[1] ("University"), attempted to cross Central Avenue. Mr. Watts was coming from the University parking lot and going to the school's engineering building when he was struck by a car driven by Earnestine J. Morris ("Driver"). Mr. Watts, who was severely injured, was taken to the hospital and died the next day. For clarity, we refer to the decedent, Clinton D. Watts, as "Mr. Watts." We refer to Gary L. Watts and Janet Watts, Mr. Watts' parents and next friends who initiated this suit as "Plaintiffs."

Central Avenue is a five-lane street running east to west that borders the northern edge of the University's central campus. The traffic on the relevant portion of Central drives west on the northernmost two lanes and east on the southernmost two lanes; the middle lane is a neutral turning lane. The speed limit on Central is forty miles per hour. Central Avenue runs between the University's central campus and a large parking lot where many University students, faculty, and visitors park. There are three crosswalks from the parking lot across Central to the University campus. The easternmost crosswalk is where Central intersects with Zach Curlin Drive, and the westernmost crosswalk is where Central intersects with Patterson Street. Between these two intersections, the University installed a third "mid-block" pedestrian crosswalk. The distance between the Zach Curlin crosswalk and the mid-block crosswalk is 940 feet, and the distance between the mid-block crosswalk and the Patterson Street crosswalk is 1,110 feet.

Driver[2] was traveling home from work down the same route that she had traveled every day for twenty years. Driver was traveling east on the inner lane when she pulled into the turning lane. Driver testified that she pulled into the turning lane because it was raining so hard that she could not see well. The trial court found that Driver struck Mr. Watts while driving approximately thirty miles per hour down Central Avenue's turning lane. At the time, Mr. Watts was standing just west of a ramp that runs perpendicular to Central, from the engineering building to the sidewalk running beside Central Avenue. It was mid-afternoon, and there was at least a light rain; the roads were wet, and there was only moderate traffic on Central at the time.

---

[1] Plaintiffs only initiated suit against Driver and the City of Memphis; they did not sue the University of Memphis.

[2] Driver was seventy-nine years old at the time of the accident.

The section of Central Avenue that borders the University has both high vehicular and pedestrian traffic.[3]  A professor at the University of Memphis testified that he was concerned about students' safely crossing the streets because he had seen students come in close proximity to cars many times since the parking lot was created approximately thirty-eight years ago.   He perceived the student crossings to be dangerous and was concerned enough that he sent a series of letters to University and City officials, including the City's Director of Public Works.  In the approximately fourteen years prior to Mr. Watts' death, there have been thirteen pedestrian accidents along the 2,050 feet of Central Avenue bordering the University.  Seven of these accidents occurred in front of the engineering building, and one of these accidents caused the death of another student.  The City's expert, Mr. Richard Moore ("Mr. Moore") testified, however, that he could not decipher an accident pattern for these 13 pedestrian accidents.  Plaintiffs' expert, Dr. Robert Stammer ("Dr. Stammer"), concedes that Central Avenue has no sight line problems, no obstructions which prevented pedestrians or vehicles from seeing each other, and the signal sequencing was adequate. Dr. Stammer opined that "if we had a street with no pedestrians and no vehicles, that would be a safe street.  But in the environment that we have there . . . the engineer has the obligation . . . to design a safe facility where motor vehicles and pedestrians can co-exist."

Over the years, the University commissioned several studies concerning the pedestrian crossings over Central Avenue.  In 1999, the University employed the Sear-Brown Group to evaluate campus traffic.  Around 2002, the City also  commissioned George Hargraves ("Mr. Hargraves"), a licensed engineer, to perform a study on how to safely facilitate pedestrian crossings on Central Avenue (hereinafter referred to as the "Hargraves Report").  Mr. Hargraves testified that he worked closely with representatives of both the City and the University in preparing his report.  The Hargraves Report indicated that the plan for installing more crosswalks would cost 1.617 million dollars; the construction plan for adding pedestrian bridges and separating the road from the parking lot with a retaining wall would cost 3.606 million dollars, and lowering Central Avenue and constructing pedestrian bridges across would cost 2.622 million dollars.  The Hargraves Report recommended lowering Central Avenue and installing pedestrian crosswalks on the east and west ends of Zach Curlin and Patterson and in front of the music school.

At trial, Plaintiffs called Dr. Stammer, a professor of civil engineering at Vanderbilt University as an expert in transportation engineering.  Prior to trial, Dr. Stammer reviewed the Sear-Brown Group study and the Hargraves Report and visited Central Avenue.  Dr. Stammer opined that the City was under an obligation to create safe and convenient pedestrian crossings.  Dr. Stammer did not think that Central Avenue, as it existed, fulfilled that obligation because the City bore some responsibility to keep pedestrians from crossing Central illegally.  Dr. Stammer listed several remedial actions that the City could have taken, such as lowering the speed limit; adding signalized crosswalks in front of the engineering building, business building, and law school; and constructing a raised median between west-bound and east-bound traffic on Central Avenue.  He clarified,

---

[3]There was testimony that the average traffic on that section of Central was over 20,000 vehicles per day.  The Sear-Brown study concluded that there were over 500 pedestrian crossings per day in front of the engineering building alone.

however, that his opinion was not that the City should have a another signalized crosswalk on Central; that suggestion was just one of several things that could have made Central less dangerous. Dr. Stammer thought that the City should have initiated an engineering study,[4] and without an engineering study, he could not say which of his various suggestions could have made the pedestrian crossings safer.

On the other hand, the Hargraves Report stated that additional crosswalks would do little to improve access across Central Avenue because the pedestrian movements across Central Avenue were scattered.[5] It also concluded that the median proposed could create a visual barrier and make it difficult for motorists to see pedestrians that were crossing the street. Mr. Hargraves testified that Central Avenue was not dangerous in and of itself but that the students crossing the street outside of the crosswalks created a dangerous condition. In addition, John Cameron ("Mr. Cameron"), an engineer and the City administrator of transportation planning and design, testified that by constructing a raised median on Central Avenue the City might actually discourage pedestrians from crossing at the signalized crosswalks that were already present. The City's expert, Don Richard Moore ("Mr. Moore") also explained that any crosswalk constructed in front of the engineering building should be controlled with a light, but a light there would create queuing[6] problems and more rear-end car collisions.

Mr. Moore testified further that Central Avenue is not deficient; there are no national, state, or local standards that required installation of marked crosswalks in this instance. Mr. Moore acknowledged that when designing streets an engineer is obligated to incorporate the needs of all people who would use that street, including automobiles, trucks, buses, bicycles, motorcycles, pedestrians, handicap features, and American Disability Act regulations. He opined that when designing safe pedestrian crossings an engineer should consider the convenience to both pedestrians and drivers; for example, drivers would find it inconvenient to stop at every driveway and would eventually begin to ignore the signals.

At trial, the parties also offered conflicting testimony regarding whether Mr. Watts was crossing Central Avenue at an unmarked crosswalk.[7] Mr. Moore explained that the accident

_____

[4] Both Dr. Stammer and Mr. Moore testified that neither the Sear-Brown Group study nor the Hargraves Report is an engineering study. Mr. Moore explained that an engineering study would include "[v]ehicle counts, pedestrian counts . . . looking at signals, locations, origin, destination, the mix of traffic, the volume of traffic at peaking periods, queuing, the list kind of goes on and on."

[5] In his deposition, the city traffic engineer referred to the student crossings as "sheet flow," meaning that pedestrians crossed Central at any point on the street.

[6] The trial court confirmed that when Mr. Moore mentioned "queuing" he used the term to refer to cars stacking up in a line.

[7] The parties refer to various types of crosswalks. These include marked crosswalks, unmarked crosswalks, and protected crosswalks, which are crosswalks safeguarded by a traffic signal.

involving Mr. Watts did not occur at a marked crosswalk but it might have occurred in an unmarked crosswalk.

### *Procedural History*

Plaintiffs initially instigated suit against both Driver and the City of Memphis, but Plaintiffs settled its claims against Driver before trial. In its answer, the City asserted several affirmative defenses, including that it was immune from suit pursuant to the Government Tort Liability Act ("GTLA") and the comparative fault of Driver. City failed, however, to assert that Mr. Watts or the University were comparatively negligent. The parties stipulated that pursuant to Tennessee Code Annotated § 29-20-37 the City of Memphis is not subject to a trial by jury for actions brought under the Governmental Tort Liability Act. During its opening statement, the City made an oral motion to amend its original Answer and plead the comparative fault of the University, but the trial court denied the motion. The City also filed a post-trial motion to amend its original Answer seeking to assert the comparative fault of Mr. Watts. Because it found that the fault of Mr. Watts was at issue during pre-trial discovery and was tried by the parties without objection, the trial court granted this motion to amend pursuant to Tennessee Rule of Civil Procedure 15.02.

Subsequently, the trial court entered its finding of facts and conclusions of law. First, it held that the Governmental Tort Liability Act did not waive the City's governmental immunity. In addition, the trial court determined that the Plaintiffs failed to prove that the City was negligent because there was insufficient evidence 1) that the City breached its duty of care, 2) that "but for" the City's action or inaction Mr. Watts' injuries would not have occurred, and 3) that the City's action or inaction was the legal cause of Mr. Watts' injuries. The trial court also opined that the City had shown by a preponderance of the evidence that both Driver and Mr. Watts were negligent. The trial court found that both Driver and Mr. Watts were each 50% at fault for the accident.

### *Issue*

Plaintiffs raise the following issue on appeal as set forth in their brief:

Whether the trial court erred in rendering judgment in favor of the City by ruling that: 1) the Watts failed to prove that Central Avenue between Zach Curlin and Patterson Ave., an area controlled by the City, is unsafe and/or dangerous; 2) Clinton Watts violated an ordinance of the City of Memphis (Sec. 11-28-3); and 3) Earnestine J. Morris and Clinton Watts were each guilty of 50% fault, but the City was not guilty of fault in Clinton Watt's injury and death.

We note that Plaintiffs can only recover for any error alleged in its second and third issues if this Court answers Plaintiffs' first issue affirmatively. In addition, the City raises an issue that the trial court erred when it denied the City's motion requesting that the court consider the comparative fault of the University.

### Standard of Review

Because the trial court adjudicated this case without a jury, we review the decision *de novo* upon the record and presume the correctness of the trial court's factual findings. Tenn. R. App. P. 13(d); *Fowler v. Wilbanks*, 48 S.W.3d 738, 740 (Tenn. Ct. App. 2000). We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence. *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). The trial court's assessment of the parties' relative fault is a factual finding, and as such we presume its correctness upon review. *Cannon v. Louden County*, 199 S.W.3d 239, 241 (Tenn. Ct. App. 2005). For it to preponderate against a trial court's finding of fact, the evidence must support another finding of fact with greater convincing evidence. *Mosley v. McCanless*, 207 S.W.3d 247, 251 (Tenn. Ct. App. 2006). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). If the trial court fails to make findings of fact, however, our review is *de novo* with no presumption of correctness. *Archer v. Archer*, 907 S.W.2d 412, 416 (Tenn. Ct. App.1995). On the other hand, we review the trial court's application of law *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). Similarly, we review mixed questions of law and fact *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).

### Immunity – City's Duty To Maintain Streets In a Condition That Is Not Defective, Unsafe, or Dangerous

Government entities, such as the City of Memphis, are immune from liability unless a plaintiff demonstrates that his claim is one of the specific causes of action for which the legislature removes immunity. Tenn. Code. Ann. § 29-20-201 (2000 & Supp. 2008); *Kirby v. Macon County*, 892 S.W.2d 403, 406 (Tenn. 1994). In this case, Plaintiffs specifically allege that the City is liable pursuant to the Government Tort Liability Act ("GTLA") Section 203, which removes governmental immunity for "any injury caused by a defective, unsafe, or dangerous condition of any street, alley, sidewalk or highway."[8] Tenn. Code. Ann. § 29-20-203(a) (2000). Tennessee Code Annotated Section 29-20-203 has three essential elements: 1) the governmental entity must own and control the location or device that allegedly caused the injury, 2) the location or device must be defective, unsafe, or dangerous, and 3) the governmental entity must have either actual or constructive notice. Tenn. Code Ann. § 29-20-203 (2000); *Burgess v. Harley*, 934 S.W.2d 58, 63 (Tenn. Ct. App. 1996). Whether a road is defective, unsafe, or dangerous necessarily depends on the standard of care imposed on governments when building and maintaining streets. *Helton v. Knox County, Tenn.*, 922 S.W.2d 877, 882–83 (Tenn. 1996).

For immunity to be removed pursuant to the GTLA, the location that allegedly caused the accident must be owned and controlled by the governmental entity being sued. *Burgess*, 934 S.W.2d at 63. Although the parties do not dispute that the City owned and controlled the street

---

[8] As they pertain to this section, a "street" or "highway" includes the traffic control devices thereon. Tenn. Code. Ann. § 29-20-203(a) (2000).

on which the accident occurred, the surrounding campus and parking lot, are owned by the University. Because the City only owns and controls the street itself, we limit the scope of our inquiry to whether the street alone is defective.

The trial court found that Central Avenue was not in a defective, unsafe, or dangerous condition. In determining whether a location is defective, unsafe, or dangerous, we apply the common law standard of care imposed on governments in building and maintaining roads. *Helton*, 922 S.W.2d at 882–83. Thus, inquiry into whether a location is defective, unsafe, or dangerous is intertwined with traditional principals of negligence, specifically whether Defendant owes Plaintiff a duty of care and whether Defendant breached that duty by acting in a manner that falls below the applicable standard of care. *See Dobson v. State*, 23 S.W.3d 324, 330 (Tenn. Ct. App. 1999).

A municipality owes the public a duty of care to "maintain the road in a 'proper, reasonably safe fashion.'" *Helton*, 922 S.W.2d at 882–83. This duty is imposed to protect both motorists and others who utilize public roadways. *Britton v. Claiborne County, Tennessee*, 898 S.W.2d 220, 223 (Tenn. Ct. App. 1994). "Local governments are not insurers against all accidents on their roads and streets. They are [nevertheless] required to use ordinary care to keep their roads and streets in reasonably safe condition for the traveling public." *Burgess,* 934 S.W.2d at 62 (internal citations omitted). Inquiry into whether a street is defective, unsafe, or dangerous should include the physical aspects of the roadway, the frequency of accidents in that specific location and the testimony of expert witnesses. *Id.* We should also consider "the physical aspects of a particular [location], together with its location, the volume of traffic, the type of traffic it accommodates, and the history of accidents occurring there." *Helton*, 922 S.W.2d. at 882 n. 10 (citing *Sweeney v. State*, 768 S.W.2d 253, 255 (Tenn. 1989)). Although the fact that accidents frequently occur at a particular location may indicate that a street or intersection is inherently dangerous,[9] it is "only one element in the equation." *Id.* at 884. The scope of the City's duty to safely maintain the roads extends to protect travelers from *unreasonable* risks of harm. *Coln v. City of Savannah*, 966 S.W.2d 34, 39–40, 4 (Tenn. Ct. App. 1998) (*overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000)). When determining the scope of a defendant's duty to a plaintiff, the court must first establish that the risk is foreseeable; then, it must apply a balancing test based upon principles of fairness to identify whether the risk was unreasonable. *Giggers v. Memphis Housing Auth.*, No. W2006-00304-SC-R11-CV, – S.W.3d –, 2009 WL 249742, at * 6 (Tenn. 2009). As our supreme court recently explained in *Giggers*:

> Although no duty will arise when a risk of injury is not generally foreseeable, foreseeability alone "is not, in and of itself, sufficient to create a duty." Rather when a minimum threshold of foreseeability is established, courts must engage in

---

[9]The fact that repeated accidents have occurred at the same location in the same manner may also give a municipality *notice* that the location is defective, unsafe, or dangerous where officers of the municipality filed accident reports. *See Sweeney v. State*, 768 S.W.2d 253, 257–58 (Tenn. 1989). Because the parties do not dispute that notice was given, however, we consider other accidents at the same location solely as they relate to the defective, unsafe, or dangerous condition.

"an analysis of the relevant public policy considerations," to determine whether a
duty enforceable in tort must be imposed.

*Id.* (internal citations omitted) (quoting *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347,
364-65, 366 (Tenn. 2008)).  The following is a non-exclusive list of various factors to consider
when determining whether a risk is unreasonable:

> [T]he foreseeable probability of the harm or injury occurring; the possible
> magnitude of the potential harm or injury; the importance or social value of the
> activity engaged in by defendant; the usefulness of the conduct to defendant; the
> feasibility of alternative, safer conduct and the relative costs and burdens
> associated with that conduct; the relative usefulness of the safer conduct; and the
> relative safety of alternative conduct.

*Id.* (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)); *see also Coln*, 966 S.W.2d at
39.

As with most determinations regarding breach of the duty of care,[10] it is a factual
question whether a location is defective, unsafe, or dangerous.  *Patterson-Khoury Wilson World
Hotel-Cherry Road, Inc.*, 139 S.W.3d 281, 285 (Tenn. Ct. App. 2003); *Helton*, 922 S.W.2d at
883. We, therefore, review the trial court's determination that the City did not breach its duty of
care *de novo* with a presumption of correctness.  *Cross v. City of Memphis*, 20 S.W.3d 642, 643
(Tenn. 2000).

The trial court found that the relevant section of Central Avenue was not in a defective,
unsafe, or dangerous condition on May 14, 2004.  In the instant case, Plaintiffs argue that the
trial court erred in two ways 1) by failing to consider the history of vehicular/pedestrian
accidents on Central Avenue, and 2) by failing to consider the pedestrian traffic patterns on
Central Avenue in front of the Engineering School.  The trial court made the following factual
findings:

> 13) Central Avenue at the University of Memphis, and particularly concentrated at
> the Engineering School, has the highest pedestrian-vehicle accident rate in
> Memphis.  There is no other location in the City that is even close.
>
> 14) Between 1990 and 2004, at least fourteen pedestrians were struck by vehicles
> on Central Avenue while crossing the street.  Seven of those pedestrians were
> struck in front of the Engineering School.  In 1995, engineering student Mohd
> Zaki Abdul Rahman was killed while crossing at the same location (four feet west
> of) where Clinton Watts was struck.

---

[10] As we have stated frequently on appeals from an order granting summary judgment, however, "[t]hese
questions become questions of law only when the facts and inferences drawn from the facts permit reasonable persons
to reach only one conclusion." *Timmons v. Metro Gov. of Nashville, Davidson County*, No. M2006-01828-COA-R3-
CV, 2007 WL 2405132, at *4 (Tenn. Ct. App. 2007) (*no perm. app. filed*).

15) . . . . There is a signalized pedestrian crosswalk midway between Deloach and Zach Curlin. The mid-campus crosswalk provides crossing between the parking lot to the north and the campus to the south. "About 42% of the mid-block crossings used this pedestrian button. The rest cross randomly throughout this section of roadway, as there is nothing to prevent them from doing so.

16) . . . . Many students crossing Central Avenue do not use the mid-campus pedestrian crosswalk and cross at mid block [[sic] locations.

17) The record conclusively established that the City was on actual notice of the high volume of pedestrian crossings of Central Avenue between Zach Curlin Drive and Patterson Street in front of the University of Memphis Engineering School where Clinton Watts was hit and killed. The city does not dispute that it was aware of the high volume of pedestrian crossings in this area for many years prior to May 14, 2004, the day Clinton Watts was hit.

. . . .

19) The plaintiffs offered the testimony of Dr. Robert E. Stammer, Jr. a professor of engineering at Vanderbilt University. . . .

Dr. Stammer expressed his opinion that the "configuration of Central Ave. in light of the known traffic patterns and pedestrians" is unsafe and very dangerous. . . . The core of his opinion is the volume of pedestrians and speed of the vehicles. He stated, "I'm not telling you exactly what you should do, but I'm saying something over the course of 13, 14, 20 years should have been done because as we sit here today, it is unsafe and dangerous." It is his opinion that the City should have "done something" although he has not opined what was required of them by any standard of care. Other than a general duty to provide "safe and convenient" crossing to pedestrians, Dr. Stammer did not identify any statute, regulation, or standard which the condition of Central Ave. violated. He did not identify a breach of any standard of care which was a legal cause or cause in fact of Ms. Morris' vehicle striking Mr. Watts.

In arguing that the trial court failed to consider the history of vehicular/pedestrian accidents on Central, Plaintiffs assert that evidence of repeated accidents at this location makes this section of Central Avenue inherently dangerous. As the Supreme Court articulated in *Helton v. Knox County*, evidence of prior accidents is, nevertheless, only one factor in the inquiry and does not in and of itself make a location defective, unsafe, or dangerous. *Helton v. Knox County, Tenn.*, 922 S.W.2d 877, 884 (Tenn. 1996). We consider this factor as it is embedded within Plaintiffs' second argument that the trial court erred by failing to consider pedestrian traffic patterns.

At trial Plaintiffs alleged that the City failed to establish proper and effective pedestrian and traffic controls which resulted in the injury and death of Clinton Watts. The trial court held,

however, that the City did not breach its duty of care because Central Avenue was not defective, unsafe, or dangerous. In its opinion, the trial court noted that there was no dispute that the sight lines and signal sequencing on Central Avenue were appropriate; it, therefore, determined that the physical aspects of the roadway had nothing to do with the accident. In addition, it held that the frequency of the accidents resulted from the pedestrians crossing in areas without crosswalks or without the protection of traffic signals. On appeal, Plaintiffs argue that the trial court erred because it failed to consider the pedestrian traffic patterns on Central Avenue in determining the standard of care imposed on municipalities to maintain roads.

We find, however, that the trial court's determination does not preponderate against the evidence. The trial court made numerous findings of fact regarding the pedestrian traffic across Central. The trial court clearly considered the physical aspects of the roadway, the frequency of accidents in that specific location, the volume of traffic, and the type of traffic it accommodates. In this particular case, this includes both the pedestrian and vehicular traffic that travel in all directions along and across Central Avenue. Although Plaintiffs alleged that the City's failure to establish proper and effective pedestrian and traffic controls resulted in the injury and death of Mr. Watts, the trial court found that no fact witness or expert witness testified as to what the City did or failed to do which resulted in Mr. Watts' injury. Plaintiffs' expert testified that the City could have made Central Avenue safer by lowering the speed limit,[11] adding more signalized mid-block crosswalks along the less than half a mile stretch of Central Avenue that borders the University, by constructing a raised median between west-bound and east-bound traffic on Central Avenue, or by physically lowering Central Avenue and building pedestrian-only viaducts from the parking lot to the University's main campus. Plaintiffs' expert opined, however, that he could not definitely say what safety measure the City should have installed; he was only certain that they should have conducted an engineering study of the area.

Thus, assuming that Plaintiffs established that the risk of pedestrian accidents was foreseeable, it still failed to establish by a preponderance of the evidence that the risk was unreasonable. As this case demonstrates, the potential consequences of harm from vehicular/pedestrian accidents can be great. Nevertheless, there is very important social value in facilitating vehicular and pedestrian travel, especially on arterial streets with heavy traffic. Furthermore, the relative costs and burdens associated with installing Dr. Stammer's suggested measures are great; the City produced evidence that increasing the number of crosswalks was likely to increase the number of rear-end automobile accidents, and installing a median would encourage more students to cross outside of the crosswalks and may inhibit motorists from seeing pedestrians. In addition, Mr. Moore testified that there was no pattern to the prior vehicular/pedestrian accidents that have occurred over the past fourteen years. Finally, the relative safety of the alternate conduct that Dr. Stammer proposes is speculative; even Dr. Stammer testifies that he cannot say what precisely the City should have done to make Central safer. Considering all of these factors, we do not find that the trial court erred in determining that

_____

[11]Although Dr. Stammer opined that the City should lower the speed limit on that section of Central Avenue, Driver was driving ten miles under the speed limit when she hit Mr. Watts. The City's failure to limit the speed limit, therefore, would not be a cause in fact or a legal cause of Mr. Watts' death.

the City did not breach its duty to maintain Central Avenue in a condition that is not defective, unsafe, or dangerous.

In addition to Plaintiffs' failure to demonstrate that the City's conduct did not fall below the standard of care, another flaw fatal to Plaintiffs' recovery is that the City's failure to act is not a cause in fact or legal causation of Mr. Watts' death. Causation in fact and legal cause are very different concepts. *Waste Mgmt., Inc. v. South Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997). Cause in fact refers to the cause and effect relationship that must be established between a defendant's conduct and a plaintiff's injury. *Id.* Legal cause, on the other hand, concerns a policy decision to deny liability where conduct might otherwise be actionable; considering logic, common sense, justice, policy, and precedent, courts establish the boundary of legal causation. *Id.*

A defendant's conduct is a cause in fact if it directly contributed to plaintiff's injury. *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005). An inquiry into cause in fact is not metaphysical; it is, rather, "a common sense analysis of the facts that lay persons can undertake as competently as the most experienced judges." *Waste Mgmt.*, 15 S.W.3d at 430. Courts often determine cause in fact using the "but for" test: "[t]he defendant's conduct is a cause in fact of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." *Id.* (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 41, at 266). It is only necessary that a defendant's conduct be a cause of the plaintiff's injury; it need not be the sole cause of the injury. *Hale*, 166 S.W.3d at 718. Plaintiffs' argument that installation of various additional crosswalks or a median would generally make Central Avenue "safer" fails to establish that the accident would not have occurred but for the City's failure to install a specific traffic device; this is precisely the metaphysical inquiry in which we should not engage. In light of the entire record, we cannot say that the evidence preponderates against the trial court's determination that Plaintiffs failed to prove, by a preponderance of the evidence, that any inaction by the City was a cause in fact of Plaintiff's injury.

To prove proximate or legal causation, a plaintiff must show that some action within the defendant's power more probably than not would have prevented the injury. *Speaker v. Cates Co.*, 879 S.W.2d 811, 814–15 (Tenn. 1994). The inquiry into legal cause is a three-part policy consideration. A plaintiff must prove that 1) the defendant's conduct was a "substantial factor" in bringing about plaintiff's injury, 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm, and 3) a person of ordinary intelligence and prudence could have reasonably foreseen or anticipated the harm giving rise to the action. *Hale*, 166 S.W.3d at 719. As we have previously explained

> [t]he word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense", which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic

-11-

sense", yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

*Lewis v. State*, 73 S.W.3d 88, 93 (Tenn. Ct. App. 2001) (quoting *Quaker Oats Co. v. Davis*, 232 S.W.2d 282, 289 (Tenn. Ct. App. 1949)).

Even if the City's failure to install additional safety devices on Central was a cause in fact of this accident, we do not believe that it was a legal cause. In this case, Mr. Watts was standing with an umbrella in Central's turning lane outside of any marked crosswalk when Driver was driving down the turning lane, and without seeing Mr. Watts at any point prior to impact, hit Mr. Watts. Under these facts we cannot say that any alleged inaction by the City was a "substantial factor" in this accident.

### *Allocation of Fault*

Plaintiffs also contend that the trial court failed to allocate any fault to the City. Our determination that the City failed to act negligently and was immune from suit pretermits any need to discuss whether the trial court properly allocated the fault between Mr. Watts and Driver.

### *Conclusion*

In light of the foregoing, we affirm the trial court's judgment in favor of the City of Memphis. Costs of this appeal are taxed to the Appellants, Gary L. Watts and Janet Watts, and their surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE