# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
October 18, 2013 Session

## GREGORY CHARLES TRAYLOR, BY AND THROUGH HIS PARENT, DAVID TRAYLOR, and DAVID TRAYLOR, INDIVIDUALLY
### v.
## SHELBY COUNTY BOARD OF EDUCATION

### Appeal from the Circuit Court of Shelby County
### No. CT-000582-11   Robert L. Childers, Judge

### No. W2013-00836-COA-R3-CV - Filed February 27, 2014

This is a slip and fall case under the GTLA.  The plaintiff high school student slipped on a patch of ice on the sidewalk at his public high school and sustained injuries.  The student filed this action against the county board of education alleging negligence.  After a bench trial, the trial court held that the defendant school board had constructive notice of the ice on the sidewalk and thus was liable under the GTLA. The school board now appeals.  After carefully reviewing the record, we find insufficient evidence in the record to support the finding of constructive notice and so reverse the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Reversed.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Valerie B. Speakman, Arlington, Tennessee, for Defendant/Appellant Shelby County Board of Education

Edward M. Bearman, Memphis, Tennessee, for Plaintiff/Appellees Gregory Charles Traylor and David Traylor

## OPINION

### FACTS AND PROCEEDINGS BELOW

Bolton High School ("Bolton") is situated on approximately 54 acres in Arlington, Shelby County, Tennessee. The school operates under the auspices of the Defendant/Appellant

Shelby County Board of Education ("School Board"). In 2010, Plaintiff/Appellee Gregory Charles "Charlie" Traylor was one of approximately 2,000 students who attended Bolton.

Temperatures in Shelby County dropped below freezing on Monday, February 8, 2010 and Tuesday, February 9, 2010, and during that period, Shelby County received approximately 1.61 inches of precipitation. As a result of the frozen precipitation, all Shelby County schools, including Bolton, were closed on February 8 and 9. By early morning on Tuesday, February 9, all precipitation had apparently ceased.

During the two days on which Bolton was closed, the school principal and the school's plant manager both spent eight hours each day shoveling and clearing all of Bolton's sidewalks and parking lots. In addition, the plant manager enlisted the assistance of a "Bobcat" operator[1] and used ice melt[2] on all of the parking lots and sidewalks, to make certain that the walkways and parking lots were properly cleared.

School resumed on Wednesday, February 10, 2010 without incident. No accidents or incidents involving the weather were reported to Bolton school officials that day.

On Thursday, February 11, 2010, plaintiff Traylor arrived at school and attended his first two classes with no problems. At approximately 9:00 a.m., Traylor walked across a grassy area to get to his next class.[3] As he stepped off the grassy area and onto the sidewalk, he slipped on some ice and fell. As a result, Traylor broke his ankle in five different places.

The Bolton school nurse examined Traylor shortly after the fall, and then he was transported to the hospital. Traylor eventually underwent surgery that included the placement of screws and metal plates in his ankle. His medical expenses totaled approximately $21,000.

On February 8, 2011, Traylor filed the instant lawsuit against the School Board in the Circuit Court for Shelby County, Tennessee. The complaint alleged that the School Board negligently failed to ensure that the school sidewalks were safe for students and sought damages for Traylor's personal injuries.

---

[1]A "Bobcat" is a name-brand piece of versatile construction or farming equipment with interchangeable attachments that can be used to clear surfaces in the event of winter weather, among other uses.

[2] "Ice melt" is a combination of chemicals in pellet form used to lower the freezing point of ice and create a liquid brine which loosens the bond between ice and a pavement, making the ice easier to remove.

[3]Documentation in the appellate record from the Southern Regional Climate Center indicates that the temperature in Shelby County on the morning of the accident remained at or below freezing until approximately 10:53 a.m.

In its answer to Traylor's complaint, the School Board asserted sovereign immunity under the Tennessee Governmental Tort Liability Act ("GTLA"), Tennessee Code Annotated § 29-20-101, *et seq*. Specifically, the School Board relied on Tennessee Code Annotated §§ 29-20-203 and -205(1); it contended *inter alia* that it did not have constructive notice of ice in the area where Traylor fell. The School Board also asserted comparative fault; it claimed that Traylor was negligent and that his negligence was the sole and proximate cause of his injuries. Discovery ensued.

After the parties had engaged in discovery, the School Board filed a motion for summary judgment. The trial court denied the motion and scheduled a bench trial.

The trial court conducted the trial in March 2013. It heard testimony from numerous witnesses, including Traylor, the school's plant manager, the school principal, and the school nurse.

Traylor testified at the outset of the trial. He said that he was a sophomore at Bolton at the time of the incident. Prior to his own fall, Traylor said, he had never seen anyone fall at the school as a result of ice or precipitation. He saw no problems when school resumed on Wednesday, February 10, after the two "snow days."

Traylor saw no ice or snow on the school's walkways when he arrived at Bolton on the morning of Thursday, February 11, at approximately 6:40 a.m., and saw none when he attended his first two classes. After he left his second class, Traylor made his way to his third class at 9:00 a.m. by walking from the south building to the other side of the campus and through a courtyard toward the north building. He then walked on a walkway headed toward the east building. Traylor testified that, while on the walkway, he was looking where he was going; he said that he walked "through the grass" and did not see anything on the walkway that appeared to be a hazard. He described the area as "kind of [] sloped" toward the teacher's parking lot and said that the way that he walked was a path that he and other students normally took. The area was not shaded and there were no warnings, cones, or ropes.

As soon as he stepped off the grass, Traylor said, he "stepped on the ice [and] slipped and fell." He heard a loud "snap" when he fell. Afterward, Traylor testified, the pain from the break was intense, about a 9½ on a 10-point scale. Traylor was first examined by the school nurse and then transported to the hospital. Once there, Traylor underwent surgery in which two plates and ten screws were surgically placed in his leg. He was unable to walk for several weeks and in significant pain for approximately three and a half months.

The trial court next heard testimony from Bolton's plant manager, Randall Tate. Tate said that he had been in that job position for approximately 16 years. His job as the school plant manager was to make sure "everything runs smooth and safe." This included "clearing the walkways in the event of some sort of weather event." He said that Shelby County provides him with the tools necessary to clear the school's walkways. In all the years he had worked at Bolton, Tate said, to his knowledge, no one had fallen as a result of any kind of precipitation.

On Monday, February 8, 2010 and Tuesday, February 9, 2010, Tate testified, Bolton was closed for snow days. On both days, Tate said, he and the school principal shoveled snow, put ice melt on the walkways, and enlisted the use of a Bobcat to ensure the school grounds were cleared. Tate noted that his own son attended Bolton at the time, so Tate had special incentive to ensure that the school's walkways were safe.

On February 10, the Wednesday that school resumed after the snow holidays, Tate put out additional ice melt before he left school. He said that he left for the day at 2:15 p.m. that afternoon. Tate recalled that the temperature went below freezing that Wednesday night.

On the morning of Thursday, February 11, prior to Traylor's fall, Tate inspected the Bolton campus, including the sidewalk on which Traylor later fell.[4] Tate described the area where Traylor fell as a fairly high traffic area:

> The best I can tell you it's a big common area, like [an] open area. There's no trees, there's no shade. You've got a building here and building there and sidewalks coming back out towards the parking lot here. It's just a big open area, common area. You've got a lot of people exiting and entering from the south building to the east from this way and some from the east going in that same route there.

Tate acknowledged there were places on the Bolton campus that Thursday morning where there was still some ice and snow on the ground, but he insisted that the area where Traylor fell was not one of them. In fact, as to the specific sidewalk on which Traylor fell, Tate testified: "With God as my witness when I walked through there there was no ice when I went through there that morning. . . . None, because I would have slipped myself had it been there." On cross examination, Tate reiterated, "There was nothing there that morning. I walked

---

[4]Tate testified at trial that he put down additional ice melt on Thursday morning, although he did not specify where on the campus it was put down. In an earlier deposition, Tate indicated that he did not put down additional ice melt Thursday morning.

through there. Had there been anything on the ground on that morning I would have fell [sic] myself."

After he heard that a student had fallen, Tate reported to the area where Traylor fell and treated it for ice. Tate testified that when he arrived at the scene of the accident, "[t]here was no ice there." Tate acknowledged, however, that he did not test the area for ice with his foot when he arrived.

The trial court next heard testimony from Bolton Principal David Stephens. Principal Stephens testified that, during his tenure at Bolton, no student had ever fallen because of frozen precipitation, other than Traylor. During the five years prior to Traylor's accident in which Principal Stephens had been Bolton's principal, Principal Stephens never saw ice accumulate in the area where Traylor fell, other than when there was snow and it accumulated everywhere. He said that he had no reports of ice in the area where Traylor fell on the morning of the incident, or any other time. Principal Stephens corroborated Tate's testimony that he personally shoveled an entire side of the campus on Monday and Tuesday, February 8 and 9, when the school was closed for snow days.

When he arrived at Bolton on Wednesday, February 10, Principal Stephens said, there were some shady spots on the south side of the campus, and he went out in his coat and tie and personally shoveled an area of frozen precipitation that he noticed that morning. However, Principal Stephens said, he relied on Tate to inspect the remainder of the campus. In his testimony, Principal Stephens acknowledged that the temperature on Wednesday night dropped below freezing, but he noted that there was no additional precipitation.

On the morning of Thursday, February 11, Principal Stephens did an inspection of some of the campus, but he again relied on Tate to inspect the entire campus. He said that, on Thursday morning, he did not see any ice in the area where Traylor fell.

When Traylor fell and broke his ankle, Principal Stephens was about 30-40 yards away. Principal Stephens explained that he often stood in that area before school and between classes because "[i]t's such a high traffic area . . . [T]here's a lot of kids that move through there." When he heard that a student had fallen, Principal Stephen said, he called Tate to come immediately to put ice melt in the area. Asked to describe the scene of Traylor's accident when he arrived, in contrast to Tate, Principal Stephens said he perceived that there was ice in the area:

> It looked like water. I mean, it looked like a wet, black – and when I got down
> to check on Charlie it was like black ice, so I was surprised that it was – it was

just very, very like a microthin sheet of, you know – and it wasn't a huge area because one thing is that sidewalk . . . that's a fairly wide area and – because when I looked at it it didn't appear to be anything but water to me, a dark black ice looking stuff.

First, Principal Stephens made sure that Traylor was being treated by the school nurse. Once he confirmed that, Principal Stephens returned to the area where the incident occurred to keep other students from being injured because they "had more kids that were coming through that area." Principal Stephens commented that he was surprised to find black ice in the area where Traylor fell:

> Then, you know, the thing that got me was we go through Wednesday and that is on the south side of the building. The north side, here we get shade, would tend to be problematic . . . but I had never seen any freezing in that area, runoff, freeze, anything like that . . . . I was dumbfounded when I went over and saw what had happened.

At one point in his testimony, Principal Stephens was asked a hypothetical question about the area where Traylor fell:

> Q.    And if it was a summer day or a spring day and it wasn't below freezing and it rains, that's a place where water would drain to, correct?
> A.    It doesn't drain to. It's a continuation of the hill. It would continue to drain down because it slopes all the way into that parking lot.

Challenged about whether he believed that the ice on which Traylor fell "magically appeared," Principal Stephens confessed that he was bewildered by it; he commented that Traylor's accident occurred "after 8:00, and we had already had hundreds and hundreds of students through that area, so I don't know when that ice formed, if it formed overnight, if it formed that morning, if it started to melt and then the temperature dropped back down. Yeah, I– I don't know any way of knowing." He speculated that perhaps snow in the grassy area melted around 8:00 a.m., flowed onto the sidewalk, and re-froze.[5]

---

[5]The director of the school facilities, John Smith, investigated the area where Traylor fell in the afternoon on the day of the accident. Smith's report was based in part on Principal Stephens' assessment of the area that morning; it stated:

> On review[,] all sidewalks appeared to be in good shape but run-off was apparent due to wet concrete surface and staining on the sidewalk. The run-off is being caused by snow, ice and

(continued...)

Principal Stephens expressed frustration that the accident occurred despite their considerable efforts to avoid just such an incident:

> We checked that campus and that campus was checked that day. And we checked – as I said earlier, there are 54 acres on that campus. There are thousands of feet of concrete. We personally for two days shoveled snow and concrete because it is important to us that even as a principal – I don't know how many principals get out on snow days and actually take that shovel for eight hours and shovel snow to make sure that campus is safe. That's how important I take my responsibilities of my job. . . . And during that time, . . . I had no inkling, I was totally shocked when a student fell because here we are, we've made it all the way, we had two days of snow, we made it all the way through Wednesday, we make it through the early morning hours of Thursday and then after second period there was this incident. And it is frustrating to me, I hated it for Charlie and I hated that he had hurt himself, and I just don't know of anything else that I possibly could have done to foresee, prevent or do that.

The trial court heard testimony from school nurse Connie Robles as well. Shortly after Traylor fell, Nurse Robles was called to the scene to examine his injury. She described the area where Traylor fell as having "a little teeny bit of a slope and it kind of goes down to a parking lot." In the three years she had worked at Bolton, Nurse Robles said, she did not know of any incidents in which someone had fallen in that area when there was precipitation.

At the conclusion of the testimony, the trial court issued an oral ruling. The trial court first recited testimony from Tate, Principal Stephens and Nurse Robles pertaining to the slope in the area where Traylor fell, the use of ice melt in that area, and the availability of more ice melt. The trial judge summarized Principal Stephens' testimony on water drainage in that area as follows: "Principal Stephens testified that the area in question where the plaintiff, Mr. Traylor, fell was a sloped area and water drains across the sidewalk." Noting that the GTLA removes sovereign immunity in some circumstances for an injury caused by an unsafe or defective condition, the trial court held that "this was an unsafe condition under all of the circumstances." The trial court then orally made the following factual findings:

---

[5](...continued)
ground thawing. It was apparent that a cleared path for walking had been provided. Principal stated that the issue yesterday when the student fell was the result of the student walking on the concrete surface that [had] re-frozen during the night. Principal stated that the surface where the student fell appeared wet but was actually ice.

The trial court implicitly declined to credited Smith's report.

The Court finds that Mr. Tate did inspect the area, but finds that Mr. Tate was negligent in not looking carefully, particularly given [Principal] Stephens' testimony that this is a sloped area, apparently they knew that before this incident, and that water typically drains across the sidewalk.

Under those circumstances, given the fact that you've got 2,000 young people traversing across this area during the day after two days of inclement weather with one day, Monday, both [Principal] Stephens and Mr. Tate being there clearing the area, and I don't mean to be critical in any of this by any stretch, they did a great job as they should have, but on Thursday morning it was incumbent on Mr. Tate to look carefully, particularly in the area where water they know is - - has a history of flowing across the sidewalk right there where the plaintiff slipped and fell.

And therefore, I find that Mr. Tate was negligent in not looking carefully on Thursday morning.

Shortly after that, counsel for the School Board pointed out to the trial court that, under the GTLA, governmental entities remain immune from liability for negligent inspection. In light of this, the trial judge later recalled the attorneys back into the courtroom to clarify his earlier oral ruling:

It's not the negligent inspection. It's that the defendant was put on notice because of the weather situation and then had two days to clear it up and there was no further weather.

So it wasn't negligent inspection; it was that they had notice and didn't– didn't remove the unsafe condition. Now, it was not removed because, as I said, Mr. Tate didn't look carefully, but it really wasn't the failure to inspect that's the basis for my ruling.

So I wanted to clarify that for the record so the record, hopefully the record at least is clear on that matter.

It was because they had a duty as the owner/occupier of the premises to inspect to make sure there weren't any unsafe conditions and they were on, the defendant the school system, was on notice, or should have been on notice. They had constructive notice of this unsafe condition, all right? Thank you-all very much.

In March 2012, the trial court entered a written order citing constructive notice as the basis for its decision:

> T.C.A. § 20-19-203 and T.C.A. § 20-19-204 removes immunity for governmental entities for unsafe or defective premises. This removal of immunity requires actual or constructive notice of unsafe conditions at Bolton High School that caused Plaintiff's injury. The Court finds in this matter that Shelby County Schools had constructive notice. Specifically the Court finds that Randall Tate, facilities manager for Bolton High School, had inspected the facility after a winter weather event, he had two days to clear the situation and did not. The Court finds that this is notice to Shelby County. He could have and should have found the ice upon which the Plaintiff slipped and fell.
>
> The Court finds that this unsafe condition caused Plaintiff's broken ankle.
>
> * * *
>
> The Court finds that the government entity did not fulfill its duty to maintain a safe premise[s] after constructive knowledge of that unsafe condition and as a result, Plaintiff suffered these injuries, pain and suffering, loss of enjoyment of life, and permanent injury to his ankle.

The trial court determined that Traylor sustained medical bills in the amount of approximately $21,000; pain and suffering in the amount of $40,000; loss of enjoyment of life in the amount of $5,000; and a permanent injury in the amount of $10,000. On this basis, it awarded a total of $76,000 in compensatory damages. The trial court also made a factual finding that "there is no comparative fault assessed against the Plaintiff."

In June 2013, the trial court filed an amended final order awarding Traylor's father, Plaintiff/Appellee David Traylor, $21,000 in damages because he paid for Traylor's medical bills. The remaining $55,000 in damages was awarded to Traylor for his pain and suffering, loss of enjoyment of life, and permanent injury. In all other respects, this amended final order was identical to the prior final order entered in March 2012. The School Board now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, the School Board raises several issues:

> Whether the trial court erred by concluding that Defendant had constructive notice that there was ice on the sidewalk.

Whether the trial court erred by concluding that an SCBE employee was negligent.

> a. Whether the trial court erred by concluding that the SCBE breached a duty.
>
> b. Whether the trial court erred by concluding that the actions of an SCBE employee were the proximate cause and cause in fact of Plaintiff's injury.

Whether the trial court erred by finding no fault on the part of Plaintiff.

Whether the trial court erred by awarding damages for permanent injury in spite of the undisputed testimony of Plaintiff's surgeon that there was no permanent injury.

Whether the trial court's judgment was excessive in light of record testimony.

Because this matter was decided by the trial court without a jury, the trial court's findings of facts are reviewed *de novo* on the record, with a presumption that those findings are correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). A trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005).

The trial court's ability to observe the demeanor of the witnesses as they testify qualifies the trial court to evaluate their credibility. *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006). As a consequence, trial courts are accorded significant deference in resolving factual disputes that hinge on the credibility of the witnesses. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *Davis*, 223 S.W.3d at 238. "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells*, 9 S.W.3d at 783 (citing *Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987)).

## ANALYSIS

We perceive that the pivotal question in this appeal is whether the proof in the record preponderates against the trial court's finding that the School Board had constructive notice of the dangerous condition that caused Traylor's injury. Therefore, we begin our analysis with this issue.

As pointed out by counsel for the School Board to the trial court below, the trial court's oral ruling could be interpreted as holding that the School Board was liable for negligent inspection of the area where Traylor fell. The trial court specifically clarified this in later remarks, and its written order did not find negligent inspection. In our analysis, we focus on the trial court's written order. The law in Tennessee is well-settled that "the court speaks through its order, not through the transcript," so appellate courts "do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks."[6] *Cunningham v. Cunningham*, No. W2006-02685-COA-R3-CV, 2008 WL 2521425, at *4-5 (Tenn. Ct. App. June 25, 2008) (quoting *Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985)).

As in most negligence actions against a governmental entity, the discussion must start with Tennessee's Governmental Tort Liability Act (GTLA), Tennessee Code Annotated § 29-20-101, *et seq*. Tennessee Code Annotated § 29-20-201 provides the overall premise of sovereign immunity for governmental entities; it states that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). However, the GTLA contains exceptions under which the governmental entity's sovereign immunity may be removed. In a premises liability action against a governmental entity, the plaintiff must prove that: (1) the governmental entity owns and controls the location or instrumentality alleged to have caused the injury; (2) a dangerous, defective, or, in the case of sidewalks, unsafe condition caused the injury; (3) the governmental entity had actual or constructive notice of the dangerous condition; and (4) the governmental entity breached either its duty to eliminate the condition or its duty to warn of the condition. *See Sears v. Metro. Nashville Airport Auth.*, No. 01A01-9703-CV-00138, 1999 WL 536341, at *5 (Tenn. Ct. App. July 27,

---

[6]The Court in *Cunningham* explained:

> A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor. A judge may modify, reverse, or make any other change in his judgment that he may deem proper, until it is entered on the minutes, and he may then change, modify, vacate or amend it during that term, unless the term continues longer than thirty days after the entry of the judgment, and then until the end of the thirty days.

*Cunningham v. Cunningham*, No. W2006-02685-COA-R3-CV, 2008 WL 2521425, at *4-5 (Tenn. Ct. App. June 25, 2008) (quoting *Broadway Motor Co., Inc. v. Fire Insurance Co.*, 12 Tenn. App. 278, 280 (1930)); *see also Ragland v. Morrison*, No. W2013-00540-COA-R3CV, 2013 WL 4805624, at *3 (Tenn. Ct. App. Sept. 10, 2013).

1999); ***Burgess v. Harley***, 934 S.W.2d 58, 63 (Tenn. Ct. App. 1996); ***see also*** Tenn. Code. Ann. §§ 29-20-203, -204 (2013). Section 29-20-204 provides:

> (a) Immunity from suit of a governmental entity is removed for any injury caused by the dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement owned and controlled by such governmental entity.

> (b) Immunity is not removed for latent defective conditions, nor shall this section apply unless constructive and/or actual notice to the governmental entity of such condition be alleged and proved . . . .[7]

Tenn. Code Ann. § 29-20-204; ***Helton v. Knox County, Tenn.***, 922 S.W.2d 877, 881-82 (Tenn. 1996); ***Petty v. City of White House***, No. M2008-02453-COA-R3-CV, 2009 WL 2767140, at *4; 2009 Tenn. App. LEXIS 599, at *10-11 (Tenn. Ct. App. Aug. 31, 2009). Thus, under this provision, the governmental entity remains immune from suit for latent defective conditions; if the governmental entity had actual or constructive notice of the "dangerous or defective condition," then immunity from suit is removed.

In the instant appeal, there is no evidence in the record that school officials had actual notice of ice in the area where Traylor sustained his injuries.[8] Consequently, we review the evidence in the record to support the trial court's conclusion that school officials had constructive notice of ice in that area. ***See Wright v. City of Lebanon***, No. M2010-00207-COA-R3-CV, 2011 WL 721508, at *2; 2011 Tenn. App. LEXIS 99, at *6 (Tenn. Ct. App. Mar. 1, 2011). "Constructive notice" has been defined as "'information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it.' " ***Hawks v. City of Westmoreland***, 960 S.W.2d 10, 15 (Tenn. 1997) (quoting ***Kirby v. Macon County***, 892 S.W.2d 403, 409 (Tenn. 1994)). Generally, a plaintiff may prove constructive notice of a dangerous or defective condition in one of three ways:

> First, a plaintiff may demonstrate that the owner or operator of the premises caused or created the condition. ***See Sanders v. State***, 783 S.W.2d 948, 951

---

[7] Section 29-20-204(b) references the procedural notice requirements in Tennessee Code Annotated § 29-20-302; however, Section 29-20-302 has been repealed.

[8] On appeal, neither party raises an issue as to whether the School Board is a governmental entity, whether the school walkway is a public improvement owned by the School Board, or whether the ice on the walkway was a dangerous or defective condition, subject to the removal of sovereign immunity. Tenn. Code Ann. § 29-20-204(a); ***see Petty***, 2009 WL 2767140, at *5; 2009 Tenn. App. LEXIS 599, at *12-14.

(Tenn. Ct. App. 1989). Second, if a third party caused or created the dangerous condition, a plaintiff may prove constructive notice by evidence that the condition "existed for a length of time" that the owner/occupier "in the exercise of reasonable care, should have become aware of that condition." *Elkins v. Hawkins County*, No. E2004-02184-COA-R3-CV, 2005 WL 1183150, at *4 (Tenn. Ct. App. May 19, 2005). Third, a plaintiff may show constructive notice by proving that "a pattern of conduct, recurring incident, or general continuing condition" caused the dangerous condition. *Blair v. West Town Mall*, 130 S.W.3d 761, 765-66 (Tenn. 2004). This is commonly called the "common occurrence" theory. All three methods of proving constructive notice are related to a defendant's superior knowledge of the premises, which is the basis for liability. *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980).

*Benn v. Pub. Bldg. Auth. of Knox Cnty*., No. E2009-01083-COA-R3-CV, 2010 WL 2593932, at *3 (Tenn. Ct. App. June 28, 2010). Paraphrasing, then, to show constructive notice of a dangerous or defective condition, a plaintiff must prove that the governmental entity caused or created the condition, that the condition had existed for sufficient time that the governmental entity should have become aware of it, or that there was a "common occurrence," i.e., a pattern of conduct, a recurring condition, or a generally continuing dangerous condition. *See Benn*, 2010 WL 2593932, at *3.

In the parties' appellate briefs, both appear to view the pivotal issue as whether the School Board knew that water regularly ran across the area where Traylor sustained his injuries, in essence the "common occurrence" type of constructive notice. We surmise that this is based on the trial court's oral ruling, which alluded to water regularly draining or flowing across the sidewalk in the subject area. However, the trial court's final written orders, initially entered in March 2012 and amended in June 2013, do not include a factual finding that water often drained or flowed across this sidewalk or that any school official had knowledge of such a fact. As noted above, in our analysis, we focus on the trial court's written orders rather than its oral ruling. *Cunningham*, 2008 WL 2521425, at *4-5.

The trial court's written order states that "Tate, facilities manager for Bolton High School, had inspected the facility after a winter weather event, he had two days to clear the situation and did not." Thus, the trial court's written order appears premised on a finding that the ice on which Traylor slipped had been there for at least two days and, despite Tate's inspection of the area, the ice was not cleared.[9] This appears more consistent with the "passage of time

---

[9]The trial court explicitly backed away from basing its holding on a finding of negligent inspection.
(continued...)

-13-

theory" of constructive notice, under which the plaintiff seeks to prove constructive notice by presenting "evidence that the condition existed for a length of time that the owner/occupier of the property in the exercise of reasonable care, should have become aware of that condition." *Benn,* 2010 WL 2593932, at *3, 4. This being the case, we review the evidence in the record that supports a finding of constructive notice under this theory.[10]

In general, in a premises liability case, the court will consider factors such as "the nature of the existing danger, its source and cause, the size, location and foreseeable consequences as well as the length of time such danger existed." *Howard v. Ammons*, 402 S.W.2d 875, 877-78 (Tenn. Ct. App. 1965); *see also Kirby v. Macon Cnty.*, No. 01A01-9206-CV-00256, 1993 WL 30616, at *4 (Tenn. Ct. App. Feb. 10, 1993) (quoting *Paradiso v. Kroger Co.,* 499 S.W.2d 78, 79 (Tenn. Ct. App. 1973) (on constructive notice, considering nature of the business, its size, location, and number of patrons)). To prove constructive notice under the "passage of time theory," the plaintiff must generally present some proof of how long the dangerous condition existed prior to the accident in question. *See Nolley v. Eichel*, No. M2006-00879-COA-R3-CV, 2007 WL 980603, at *2 (Tenn. Ct. App. Apr. 2, 2007) ("A plaintiff must submit proof as to how long the allegedly dangerous condition existed prior to the accident.") (quoting *Hardesty v. Serv. Merchandise Co., Inc.,* 953 S.W.2d 678, 683 (Tenn. Ct. App. 1997)). In cases in which the dangerous condition is ice, such proof can take a variety of forms. *See Benn*, 2010 WL 2593932, at *4 (photographs of staining on an air conditioner unit and nearby vicinity was evidence that a leak leading to ice had existed for a long time); *Murphy v. 136 N. Blvd. Associates*, 304 A.D.2d 540, 541 (N.Y. 2003) (summary judgment in favor of defendant was appropriate where "[t]he plaintiff presented no evidence concerning the length of time the ice was on the ground before her fall, or whether the defendant received prior complaints about the condition."); *Armstrong v. City of Monett*, 228 S. W. 771, 774 (Mo. 1921) (evidence of "freezing and thawing and trampling by pedestrians" indicated that sidewalk had been frozen for at least a day; this was not sufficient to support a finding that city had failed to clean the area in reasonable time).

Despite Tate's protestations that there was no ice on the sidewalk where Traylor fell, the trial court made a factual finding that Traylor slipped on ice on the sidewalk. The evidence,

---

[9](...continued)

Tennessee Code Annotated § 29-20-205(4) provides that a governmental entity's immunity from suit may be removed for injuries caused by an employee's negligent act or omission unless the injury arose out of the governmental entity's "failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property." Tenn. Code Ann. § 29-20-205(4) (2012).

[10]Since the trial court made no factual finding in its written order of a pattern of water flowing or draining across the sidewalk or any type of recurring dangerous condition, we do not address the evidence on this issue, such as the hypothetical Principal Stephens was asked about conditions in spring or summer in the area in question.

including the testimony of Principal Stephens, supports this factual finding. Principal Stephens testified that when he went to the accident scene immediately after Traylor fell, he saw and felt a thin, micro-sheet of black ice in that location. The record does not indicate the size of the area with the black ice, only that "it wasn't a huge area."

Beyond the fact that ice was present in that location when Traylor fell, the evidence in the record is sparse. The undisputed evidence was that temperatures in Shelby County dropped below freezing on Monday, February 8, 2010 and Tuesday, February 9, 2010, and during that period, Shelby County received about an inch and a half of frozen precipitation. Due to the inclement weather, Bolton closed on Monday and Tuesday, February 8 and 9. The evidence indicated that the precipitation ended by Tuesday morning and there was no further precipitation prior to Traylor's accident. The undisputed evidence also showed that temperatures in Shelby County went below freezing the night of Wednesday February 10, and remained below freezing when Traylor made his way across the Bolton campus the morning of Thursday, February 11.

Were this the only evidence in the record regarding the ice, we might be inclined to hold that the evidence supports the trial court's finding that the ice on which Traylor fell had been in that location for at least two days, stemming from the inclement weather that closed Bolton on Monday and Tuesday, February 8 and 9, and that Tate should have and could have found the ice and cleared it off the sidewalk. It is not, however, the only evidence in the record.

The evidence also showed that Tate and Principal Stephens put prodigious effort into removing ice and snow from the school's sidewalks, including hours of shoveling and repeated applications of ice melt. Tate said that he put down more ice melt on Wednesday afternoon before he left the school grounds, although he did not say that he put down more ice melt in the specific area where Traylor fell. It is undisputed that there were no reports of ice on the sidewalk and no incidents during the entire school day Wednesday or on Thursday morning prior to the accident. Tate, Principal Stephens, and Traylor all testified that the area where Traylor fell got heavy foot traffic; Traylor described it as a path that he and other students "normally took" and Principal Stephens said it was "a high traffic area . . . there's a lot of kids that move through there." All of this evidence militates against a finding that the ice on which Traylor fell formed during the inclement weather on Monday and Tuesday, February 8 and 9, and remained there until Traylor slipped on it on Thursday morning. Moreover, Principal Stephens' testimony was undisputed that the ice in the area where Traylor fell was "black ice," that it did not visually appear to be ice, and that he could tell that it was ice only when he touched it. This evidence, combined with the evidence of the heavy foot traffic that had gone through the area in question on Wednesday and early Thursday morning,

-15-

militates against a finding that Tate should have and could have seen the ice and cleared it away before Traylor fell on it.

The trial court found that Tate "had two days to clear the situation [after the inclement weather] and did not. The Court finds that this is notice to [the School Board]. [Tate] could have and should have found the ice upon which the Plaintiff slipped and fell." In reviewing the record as a whole, we must find that "the aggregate weight of the evidence" does not demonstrate that the trial court's factual finding "is more probably true than any other factual alternative." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 n. 19 (Tenn. Ct. App. 2005). The evidence does not preponderate in favor of the trial court's finding that the ice had been on the sidewalk in question for two days and that Tate could have and should have seen it and cleared it away.

For this reason, we must respectfully disagree with the trial court's holding that the School Board had constructive notice of the ice on which Traylor slipped and fell. This leaves no basis on which to hold the School Board liable for Traylor's injuries. "Property owners cannot be held liable for failing to remove natural accumulations of snow or ice when they had no notice of the condition." *Bowman v. State*, 206 S.W.3d 467, 473 (Tenn. Ct. App. 2006).

This holding pretermits all other issues raised on appeal.

## CONCLUSION

The decision of the trial court is reversed. Costs on appeal are assessed against Plaintiff/Appellees Gregory Charles Traylor and David Traylor, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE